Richard R. CASTALDO, Dominic R. Castaldo and Connie Michalik, Plaintiffs,

v.

Jefferson County Sheriff John C. STONE, individually and in his official capacity, Former Jefferson County Sheriff Ronald Beckham, individually and in his official capacity, Jefferson County Sheriff's Department, Neil Gardner, individually, John Hicks, individually, Mark M. Miller, individually, Tanya Williams, individually, Mike Guerra, individually, Phillip Lebeda, individually, John or Jane Does 2 through 10 (All Deputies in the Jefferson County Sheriff's Department), individually, Jefferson County School District R–1, Frank DeAngelis, individually and in his official capacity, Howard Cornell, individually and in his official capacity, Peter Horvath, individually, William Butts, individually, Garrett Talocco, individually, Judy Kelly, individually, Tom Tonelli, individually, Tom Johnson, individually, John or Jane Does 11 through 30, individually, Thomas

Klebold, Susan Klebold, Phillip Duran, Robyn Anderson, James Royce Washington, Ronald Frank Hartmann, J.D. Tanner, dba Tanner Gun Show, Robert Kirgis, and Kirgis, Inc., a Colorado Corporation, Defendants.

No. CIV.00–B–1611.

United States District Court, D. Colorado.

Nov. 27, 2001.

James A. Cederberg, Buchanan, Jurdem & Cederberg, PC, Denver, CO, for plaintiffs.

J. Andrew Nathan, Andrew J. Fisher, Bernard Roland Woessner, Nathan, Bremer, Dumm & Myers, PC, Denver, CO, William A. Tuthill, III, Lily Wallman Oeffler, Jefferson County Government Center, Golden, CO, Alan Kaminsky, Wilson, Elser, Moskowitz, Edelman & Dicker, New York, NY, for Ronald Beckham, Neil Gardner, John Hicks, Mark M. Miller, T. Williams, John Healy, Mike Guerra, Philip Lebeda, John C. Stone, Tanya Williams, defendants.

William J. Kowalski, Susan S. Schermerhorn, William Stuart Stuller, Caplan & Earnest, L.L.C., Boulder, CO, for Frank DeAngelis, Garrett Talocco, Judy Kelly, Tom Johnson, defendant.

Gregg E. Kay, Franklin D. Patterson, Patterson, Nuss & Seymour, P.C., Englewood, CO, for Susan Klebold, Thomas Klebold, defendants.

C. Michael Montgomery, Joel A. Kolodny, Lorraine Elizabeth Parker, Steven Gregory Greenlee, Montgomery, Kolodny,

Amatuzio, Dusbabek & Parker, LLP, Denver, CO, for Wayne Harris, Katherine Harris, defendants.

Andrew J. Fisher, Bremer, Dumm & Myers, PC, Denver, CO, Michael B. Sullivan, Candace Sturdivant, Heather A. Salg, Harris, Karstaedt, Jamison & Powers, P.C., Englewood, CO, for Phillip Duran, defendant.

J. Stephen Mullen, Retherford, Mullen, Johnson & Bruce, Colorado Springs, CO, Scott Jurdem, Buchanan, Jurdem & Cederberg, PC, Denver, CO, Alaurice Marie Tafoya, Alaurice M. Tafoya Law Office, Denver, CO, for Mark Manes, defendant.

William Stuart Stuller, Caplan & Earnest, L.L.C., Boulder, CO, for Jefferson County School District R-1, Peter Horvath, William Butts, Tom Tonelli, defendants.

Richard Lee Everstine, Michele R. Prud'Homme, Robert Patrick Ingram, Dickinson, Everstine & Prud'Homme, Denver, CO, for Robyn Anderson, defendant.

Gordon Lamar Vaughan, Sara A. Ludke, Vaughan & DeMuro, Colorado Springs, CO, for James Royce Washington, defendant.

Michael R. Waters, Jones & Waters, LLC, Colorado Springs, CO, for Ronald Frank Hartmann, defendant.

Lori Mary Moore, Retherford, Mullen, Johnson & Bruce, Colorado Springs, CO, Matthew Y. Biscan, Malcom S. Mead, Hall & Evans, Denver, CO, for J.D. Tanner, defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, Chief Judge.

Defendants Jefferson County Sheriff's Department (Sheriff's Department) and Sheriff John C. Stone, Former Jefferson County Sheriff Ronald Beckham, Deputy Sheriff Neil Gardner, Deputy Sheriff John Hicks, Deputy Sheriff Mark M. Miller, Deputy Sheriff Tonya Williams (incorrectly identified as Tanya Williams), Deputy Sheriff Mike Guerra, and Deputy Sheriff Phillip Lebeda, (collectively, Sheriff Defendants) move, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss all claims brought by Plaintiffs Richard R. Castaldo, Dominic R. Castaldo, and Connie Michalik, (collectively, Plaintiffs). In a separate Rule 12(b)(6) motion, Defendants Jefferson County School District R–1 (School District) and Frank DeAngelis, Howard Cornell, Peter Horvath, William Butts, Garrett Talocco, Judy Kelly, Tom Tonelli, and Tom Johnson (collectively, individual School Defendants), also seek dismissal. After consideration of the motions, briefs, arguments of counsel, and for the following reasons, I grant the motions.

## I.

### Facts

#### A. General Allegations

The following facts are alleged in Plaintiffs' Third Amended Complaint. On April 20, 1999, at approximately 11:20 a.m., Plaintiff Richard Castaldo, a Columbine High School student, was shot and seriously injured outside the school near the rear door to the cafeteria, (C/O) ¶¶ 1, 24, by fellow students Dylan Klebold and/or Eric Harris. C/O ¶¶ 24–25. The attack, apparently in the planning stages for more than a year, involved complex preparations, including construction of bombs and the acquisition and modification of firearms. C/O ¶ 26. Harris' and Klebold's actions resulted in the deaths of twelve students and one teacher, and serious physical injuries to some twenty-six others, including Richard Castaldo. *Id.* at ¶ 29.

#### B. Sheriff Defendants

Sheriff Stone has served as the Sheriff of Jefferson County, Colorado since Janu-

ary 1999. C/O ¶ 24. Sheriff Beckham was the Sheriff at all material times until January 1999. *Id.* at ¶ 115.

Plaintiffs allege that in January 1998, Eric Harris and Dylan Klebold broke into a van to steal tools. The two were apprehended by the Sheriff's Department, prosecuted by the Jefferson County District Attorney, and placed in a Jefferson County juvenile offender diversion program on March 28, 1998. C/O ¶ 68. The Sheriff Defendants, including but not limited to Deputies Gardner, Hicks, Lebeda, and Healy knew, based on statements contained in a Web site, that Harris and Klebold were in violation of the terms of the diversion program. C/O ¶ 95.

On March 18, 1998, shortly before Harris and Klebold were placed in the diversion program, Deputy Miller received a complaint from Randall Brown, a Jefferson County citizen, that Eric Harris had made repeated threats against the life of his son, Brooks Brown, also a Columbine student. C/O ¶ 69. According to Mr. Brown, Harris talked often about making pipe bombs and killing people. *Id.* During their meeting, Mr. Brown and his wife gave Deputy Miller a printout of information contained on Harris' Web site. *See* C/O Attachment, Exhibit A. These pages contain: 1) death threats; 2) written plans to use pipe bombs to kill numerous people; 3) a specific description of a pipe bomb detonated by the pair; and 4) descriptions of other bombs being built by Harris and Klebold. C/O ¶ 69; *See* Exhibit A.

After meeting with the Browns, Deputy Miller completed an incident report, attached the Web site printout, and submitted it to his supervisor, Deputy Lebeda. C/O ¶ 71. At Deputy Lebeda's direction, Deputy Miller's report, including the Web site printout, was forwarded to Deputy Gardner, assigned full-time to Columbine High School as a student resource officer. C/O ¶ 72. Deputy Gardner's job duties as

school resource officer included contact with students and school staff and awareness of law enforcement issues and student safety. *See* C/O ¶ 53. Deputy Gardner was also briefed on the reports concerning Harris and Klebold. *Id.* at ¶ 73.

Deputy Hicks, assigned to investigate the Web site information, C/O ¶ 117, met with Mr. and Mrs. Brown and bomb squad deputies, including Deputy Guerra. *Id.* at ¶ 81. Deputies Healy and Williams were also assigned investigative duties concerning the Web site. *Id.* at ¶ 82. Apparently, the Sheriff's Department unsuccessfully attempted to access the Web site. *See* Exhibit A. Plaintiffs allege that the Web site remained accessible until after the attack. *Id.* at ¶ 97.

Prior to April 20, 1999, Harris added the following information to the Web site on "three different information panels":

| | |
|---|---|
| Hobbies: | Preparing' for the big April 20! You'll all be sorry that day. |
| Occupation: | Senior at CHS and the rest is still unpublished. |
| Personal Quote: | when in doubt, pull it out. (computers) ——shut up and shoot it —— quit whining, it's just a flesh wound —— Kill Em AALLLLL!!!! |

*Id.* at ¶ 98. The Complaint does not contain the date this information was added or if the statements were made together or separately.

At some point after the first meeting between Deputy Hicks and the Browns, initial steps were taken to obtain a search warrant in connection with Harris' activities. C/O ¶ 85. Ultimately, the search warrant application was halted by "someone in a position of authority in the Sheriff's Department." *Id.* At approximately the same time, all follow-up on the Brown's complaint "apparently ceased." *Id.* at ¶ 86.

Plaintiffs allege that investigation of the Browns' report and the Web site was intentionally aborted by someone in authori-

ty in the Sheriff's department for reasons unrelated to legitimate law enforcement considerations. C/O ¶¶ 85–89. In radio communications during the immediate aftermath of the attack, two deputies refer to one of the shooters as "the Sheriff's guy." *Id.* at ¶¶ 91, 92.

## C. School Defendants

Defendant DeAngelis was the Columbine High School principal. C/O ¶ 10. There are no allegations that Mr. DeAngelis knew Harris and Klebold. Plaintiffs allege that "Columbine High School officials knew ... about Harris and Klebold talking about blowing up the school." C/O ¶ 166. As principal of Columbine, Defendant DeAngelis is a Columbine High School official. Therefore, it is alleged that Defendant DeAngelis knew that Harris and Klebold talked about blowing up the school. There are no allegations that Mr. DeAngelis knew about any other activities of Harris and Klebold.

Plaintiffs allege that Columbine disciplinary assistant principal, Defendant Horvath, also a Columbine High School official, was aware of Harris' and Klebold's probationary status for the van break-in, *id.* at ¶ 149, and their school suspension for hacking into school computers and stealing locker combinations. *Id.* at ¶ 150. Before the shootings, Mr. Horvath thought that Harris "was on the edge of losing control." Afterward, he admitted that he "was not totally shocked" that Harris and Klebold "did it." *Id.* at ¶ 149. As a Columbine official, he knew that Harris and Klebold talked about blowing up the school. *Id.* at ¶ 167.

Defendant Butts was a counselor assigned to Dylan Klebold. Several weeks before April 20, 1999, Defendant teacher Judy Kelly provided Mr. Butts with a copy of a story written by Klebold because of her concern over its vicious nature. C/O ¶¶ 151, 161. Plaintiffs allege he also knew

or should have known of Klebold's other activities. *Id.*

Defendant Talocco was a teacher in a video production class in which Eric Harris presented a videotape filmed inside the school depicting himself and Dylan Klebold enacting revenge shootings of other Columbine students, including athletes, using fake guns. C/O ¶ 152. Mr. Talocco allowed Harris and Klebold to participate in other video production classes in which they were not enrolled and had frequent contact with them in the school's video lab. *Id.* at ¶ 14. Other videos presented by Harris and Klebold in Defendant Talocco's class show Harris and Klebold carrying guns, presumably fake, down the school hallways, *id.* at ¶ 53, computer graphics of the school exploding, *id.* at ¶ 154, and a collage of violent shooting scenes from commercial movies. *Id.* at ¶ 155. In these videos and in class discussion, Harris and Klebold spoke of killing, of their ownership of guns, and of their bombmaking abilities. *Id.* at ¶ 157.

In addition, Defendant Talocco was responsible for being familiar with student-produced materials placed on the school's tech lab computer and video productions kept on the school's server. *Id.* at ¶ 159. The school's video lab contained multiple videos depicting "various students ... in videos involving firearms," and a video taken somewhere in the mountains showing Harris shooting a shotgun and Klebold shooting a TEK-9, two of the weapons used in the April 20th attack. *Id.* at ¶ 159.

Defendants Johnson and Kelly were teachers of Harris' and Klebold's psychology and creative writing classes. In each class, Harris and Klebold wrote and spoke of their hatred, anger, possession of firearms, and desire and intent to kill and injure others, including Columbine students. C/O ¶¶ 160, 163.

In the fall of 1998, in Harris' and Klebold's Government and Economics class, taught by Defendant Tonelli, the pair submitted a video depicting themselves as "hit men" hired by "geeks" to avenge abuse by "jocks." C/O ¶ 164. In this video, filmed on school premises, Harris and Klebold enacted shooting "jocks," spoke of killing, and used a computer graphics program to depict the school exploding. *Id.*

Plaintiffs allege that Deputy Gardner and the other Sheriff Defendants never informed the School Defendants of the Web site contents. *See* C/O ¶¶ 79, 100. In the alternative, they allege that the School Defendants were aware of the contents of Harris' Web site well before April 20, 1999. *See* C/O ¶ 167.

According to Plaintiffs, Deputy Gardner knew or should have known the information available to the Columbine teachers and school officials, including the video tapes, writings and verbal statements. *Id.* at ¶¶ 74, 168.

## II.

### Claims

Plaintiffs assert the following claims against the Sheriff Defendants and the School Defendants:

#### Claim One

Willful and wanton conduct against the Sheriff Defendants, individually, except the Jefferson County Sheriff's Department—failure to investigate.

#### Claim Two

42 U.S.C. § 1983—Deprivation of right to life, liberty, and personal security—against individual Sheriff Defendants, except the Jefferson County Sheriff's Department—failure to investigate—based on creating or substantially enhancing the danger faced by Plaintiffs.

#### Claim Three

42 U.S.C. § 1983—Deprivation of right to life, liberty, and personal security—against Sheriffs Beckham and Stone, in their official capacities, and the Jefferson County Sheriff's Department, based on inadequate policies, practices, and training.

#### Claim Four

Willful and wanton conduct against individual School Defendants, in their individual capacities, except the Jefferson County School District R–1.

#### Claim Five

42 U.S.C. § 1983—Deprivation of right to life, liberty, and personal security—against individual School Defendants, in their individual capacities, except the Jefferson County School District R–1 based on special relationship and creating or substantially enhancing the danger faced by Plaintiffs.

#### Claim Six

42 U.S.C. § 1983—Deprivation of right to life, liberty, and personal security—against Defendants DeAngelis, in his official capacity, and the Jefferson County School District R–1, for inadequate policies, customs, practices, and training.

#### Claim Eleven

Violation of Colorado Constitution, Art. II, Secs. 6, 25, against Sheriff Defendants, except Jefferson County Sheriff's Department, in their individual capacities.

#### Claim Twelve

Violation of Colorado Constitution, Art. II, Secs. 6, 25, against School Defendants, except Jefferson County School District R–1, in their individual capacities.

These claims are premised on Defendants' alleged actions and omissions preceding the Columbine attack but not during the attack itself.

Defendants move, pursuant to Fed. R.Civ.P. 12(b)(6), to dismiss all federal claims for failure to state claims upon

which relief can be granted. Further, the individual Defendants, accepting as true Plaintiffs' well pleaded facts, assert entitlement to qualified immunity from suit as to the § 1983 claims. They also seek dismissal of Claim One and Claim Four as barred by the Colorado Governmental Immunity Act, § 24–10–101, *et seq.* and Claims Eleven and Twelve for reasons later addressed.

### III.

### Fed.R.Civ.P. 12(b)(6)

Under Rule 12(b)(6), I may dismiss a complaint for failure to state a claim upon which relief can be granted if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). If the plaintiff has pleaded facts that would support a legally cognizable claim for relief, a motion to dismiss should be denied. *Id.* I accept as true all well-pleaded facts, as distinguished from conclusory allegations, and view those facts in the light most favorable to the nonmoving party. *See Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304 (10th Cir.1998). All reasonable inferences must be construed in the plaintiff's favor. *See Dill v. City of Edmond*, 155 F.3d 1193, 1201 (10th Cir.1998). Materials attached to a complaint and incorporated into it may be considered without converting the Rule 12(b)(6) motion to one of summary judgment. *Hall v. Bellmon*, 935 F.2d 1106, 1112 (10th Cir.1991).

### IV.

### Qualified Immunity

All individual Defendants maintain they are entitled to qualified immunity from Plaintiffs' claims brought under 42 U.S.C. § 1983 because the contours of the pertinent law were not clearly established on April 20, 1999.

■ The principles of qualified immunity are settled. The purpose of a qualified immunity defense under § 1983 is to limit the deleterious effects that the risks of civil liability would otherwise have on government operations at all levels, federal, state, and local. *See Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Discretionary decisions by government actors inevitably impact the lives of private individuals, sometimes with harmful effects. Moreover, such decisions are inescapably imperfect. Especially in the context of police work, decisions must be made in an atmosphere of great uncertainty. Holding police officers liable in hindsight for every injurious consequence of their actions would paralyze the functions of law enforcement. *See Tangwall v. Stuckey*, 135 F.3d 510, 520 (7th Cir.1998); *Torchinsky v. Siwinski*, 942 F.2d 257, 260 (4th Cir.1991). The same can be said of public school administrators and teachers. Qualified immunity thus allows officials the freedom to exercise fair judgment, protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

■ Qualified immunity under § 1983 shields officials from civil liability unless their actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The linchpin of qualified immunity is objective reasonableness. *Anderson*, 483 U.S. at 639, 107 S.Ct. 3034. So long as a public official's actions, viewed from the perspective of the official at the time, can be seen within the range of reasonableness, then no liability will attach. *See id.*

■ Important to this reasonableness inquiry is whether the rights alleged to

have been violated were clearly established at the time of the challenged actions. *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727. If the law supporting the allegedly violated rights was not clearly established, then immunity must lie. *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034; *Tarantino v. Baker*, 825 F.2d 772, 774 (4th Cir.1987). Where the law is clearly established, and where no reasonable official could believe he was acting in accordance with it, qualified immunity will not attach. The purpose of this doctrine is to ensure that government actors such as police officers and public school teachers have notice of the extent of constitutional restrictions on their behavior. *See Davis v. Scherer*, 468 U.S. 183, 195, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). Thus, qualified immunity prevents officials from being blindsided.

■ In a § 1983 suit for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence. Where a defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. *See Saucier v. Katz*, 533 U.S. 194, 199–201, 121 S.Ct. 2151, 2155–56 (2000). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.* As a result, the Supreme Court has stressed "the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991).

■ In *Siegert v. Gilley*, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), the Supreme Court clarified the appropriate framework for reviewing qualified immunity from § 1983 substantive due process claims. Under *Siegert*, I must first determine whether Plaintiffs "ha[ve] asserted a violation of a constitutional right at all." *Id.* at 232, 111 S.Ct. 1789. If Plaintiffs have asserted the violation of a constitutional right, then I determine whether that right was clearly established so that reasonable officials in Defendants' situation would have understood their conduct violated that right. *Id.* at 233, 111 S.Ct. 1789; *Liebson v. New Mexico Corrections Dept.*, 73 F.3d 274, 276 (10th Cir.1996); *Martinez v. Mafchir*, 35 F.3d 1486, 1490 (10th Cir. 1994).

## V.

### Claims Against the Sheriff Defendants

**A. Claim One—Willful and Wanton Conduct Against the Sheriff Defendants, individually, except the Jefferson County Sheriff's Department—failure to investigate**

The Sheriff Defendants move to dismiss Claim One: 1) because it is barred by the Colorado Governmental Immunity Act, Colo.Rev.Stat. § 24–10–103(4)(a); and 2) pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted.

#### 1. Colorado Governmental Immunity Act

The Colorado Governmental Immunity Act, Colo.Rev.Stat. § 24–10–101, *et seq.* (CGIA), covers "all the circumstances under which the state, any of its political subdivisions, or the public employees of such public entities may be liable in actions which lie in tort." *Id.* at § 102. The term "public entity" is defined as "the state, county, city and county, municipality, school district … and every other kind of

district, agency, instrumentality, or political subdivision thereof organized pursuant to law." *Id.* at § 103(5). "Public employee" is defined as "an officer, employee, servant, or authorized volunteer of the public entity." *Id.* at § 103(4). There is no dispute that the Sheriff Defendants are public employees under the CGIA.

 A public employee may only be held liable for conduct that is willful and wanton:

> [a] public employee shall be immune from liability in any claim for injury ... which lies in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by a claimant and which arises out of an act or omission of such employee occurring during the performance of his duties and within the scope of his employment *unless the act or omission causing injury was willful and wanton.*

*Id.* at § 118(2)(a) (emphasis added). In any action alleging that an act of a public employee was willful and wanton, "the specific factual basis of such allegations shall be stated in the complaint." *Id.* at § 110(5)(a). Failure to plead the factual basis results in dismissal for failure to state a claim upon which relief can be granted. *Id.* at § 110(5)(b). Whether a plaintiff has pleaded sufficient facts to state a claim based upon willful and wanton conduct is a matter determined by the court. *Barham v. Scalia,* 928 P.2d 1381, 1385 (Colo.App.1996).

The phrase "willful and wanton" is not defined in the CGIA. I look then to controlling Colorado case law to assess the conduct alleged here.

In *Terror Mining Co., Inc. v. Roter,* 866 P.2d 929 (Colo.1994) the mother of two small children brought tort claims against the children's father for injuries suffered in a vehicle accident. The father, Dr. Roter, asserted parental immunity. Dr. Roter, an orthopaedic surgeon, incorporated

Terror Mining Company, Inc. (TM) to operate a gold mine and was its sole shareholder and employee. Dr. Roter was working the gold mine accompanied by his daughters, ages two and four years. Dr. Roter attempted to transport a large mining cable spool from an upper driveway to a lower storage area using a Unimog, an off-road construction vehicle designed to accommodate multiple tasks including transporting heavy equipment to job sites, snowplowing, sweeping, front-end loading, trenching and backfilling. Much like a pick-up truck in appearance, the Unimog rides high above the ground on oversized tires. The Unimog has several attachments which can be fitted at the front, middle or rear of the vehicle. The Unimog was equipped with both a 1600 pound front end loader and a 2000 pound counterweight. The counterweight was secured to the posterior bed of the Unimog with a steel restraining band.

After Dr. Roter loaded the steel cable in the front end loader, his two daughters asked Dr. Roter if they could ride in the rear of the Unimog. Dr. Roter agreed and placed them in the rear bed of the vehicle. He then drove down a gravel and dirt road that runs parallel to and roughly thirty to forty feet above Boulder Creek. The road has a grade of approximately seven percent (7%). The counterweight broke loose, propelling the counterweight forward. The resulting shift in the position of the counterweight threw the Unimog out of balance, causing Dr. Roter to lose control of the vehicle. Dr. Roter jumped out of the vehicle and tried to rescue his children. Before he could reach them the Unimog ran over the edge of the road. The children were thrown into Boulder Creek and sustained severe injuries.

The issue addressed by the Colorado Supreme Court was whether Dr. Roter's

actions qualified under the "willful and wanton misconduct" exception to the parental immunity doctrine. *Id.* at 930.

The *Roter* Court cited the following definitions of "willful and wanton" conduct:

1. where defendant pursues a highly hazardous course with the knowledge that tragic consequences are *highly probable,* defendant's conduct is reckless or wanton, and not merely negligent or careless. *Steeves v. Smiley,* 144 Colo. 5, 9–10, 354 P.2d 1011, 1014 (1960). (emphasis added);

2. ordinary or simple negligence should be considered as resulting from a passive mind, while a willful and wanton disregard is the result of an active and purposeful intent. *Pettingell v. Moede,* 129 Colo. 484, 271 P.2d 1038 (1954);

3. willful and wanton conduct, for purposes of awarding exemplary damages, "means conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to the consequences, or of the rights and safety of others". Colo.Rev.Stat. § 13—21–102(1)(b)(1987).

*Roter,* 866 P.2d at 934.

The Court then incorporated in its "willful and wanton" analysis the following language from *Steeves:*

in order to fall within the scope of the willful and wanton misconduct exception to the parental immunity doctrine, the Roter children would need to allege in their complaint or assert in their response in opposition to Dr. Roter's motion, facts that would, at the least, raise an inference that when Dr. Roter placed his children in the bed of the Unimog for the purpose of transporting the spool of cable, he did so consciously, knowingly, with reckless disregard of, or intentionally having considered that the tragic

consequences which occurred were *"highly probable."*

*Id.* (emphasis added).

In conclusion, however, the *Roter* Court employed slightly different language:

Thus, we concur with the district court that while the facts alleged ... might suggest that Dr. Roter's conduct ... was unreasonable or negligent, plaintiff[s] failed to sufficiently plead specific facts ... upon which a reasonable inference could be drawn that Dr. Roter purposefully pursued an activity that he had considered, *more likely than not,* would result in the tragic accident injuring the Roter children.

*Id.* (emphasis added.). In both instances, however, probability terms were used in assessing whether Dr. Roter's conduct was "willful and wanton." *Id.*

Four months later, the Colorado Supreme Court decided *Moody v. Ungerer,* 885 P.2d 200 (Colo.1994), the most recent Colorado Supreme Court decision concerning willful and wanton conduct under the CGIA. After noting that "willful and wanton" is not defined by the CGIA, the *Moody* Court recited the following definitions of the phrase "willful and wanton:"

1. Section 13–21–102(1)(b)(exemplary damages):

As used in this section, "willful and wanton conduct" means conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff.

2. *Pettingell v. Moede,* 129 Colo. 484, 491, 271 P.2d 1038, 1042 (1954):

"wholly disregardful of the rights, feelings and safety of others ... at times even imply[ing] an element of evil." (automobile guest statute)

3. Blacks Law Dictionary 1434–35 (5th ed.1979)

> In order to constitute 'willful and wanton' misconduct, act or omission must be not only negligent, but exhibit conscious disregard for safety of others.

Inexplicably, the *Moody* Court neither cited nor referred to *Roter* or *Steeves* defining "willful and wanton" as a state of mind to include "knowledge that ... consequences are highly probable." At first glance, there appears to be an ambiguity between the standards I consider in evaluating the Sheriff Defendants' conduct. Upon close reading of *Pettingell,* however, the cases are consistent.

In *Pettingell,* the court explained:

> Willful action means voluntary; by choice; intentional; purposeful. Wantonness signifies an even higher degree of culpability in that it is wholly disregardful of the rights, feelings and safety of others. *It may, at times, even imply an element of evil.* One may be said to be guilty of "wanton and willful disregard" when he is conscious of his misconduct, and *although having no intent to injure any one, from his knowledge of surrounding circumstances and existing conditions* is *aware that his conduct in the natural sequence of events will probably result in injury* to his guest, and is unconcerned over the possibility of such result.

*Id.* at 1042. (emphasis added).

As stated, the *Pettingell* Court employed probability language in its definition of "willful and wanton." Because *Moody* cited *Pettingell, Moody* can be said to fairly represent *Roter's* holding as to "willful and wanton" conduct. I note that *Roter* employed probability language in defining "willful and wanton" in an immunity context as distinguished from exemplary damages. Although immunity there was parental, the immunity here is govern-mental, entitled to at least equal treatment.

For purposes of this case, I construe controlling Colorado court authority to mean that for a defendant's conduct to be "willful and wanton" under the CGIA that defendant must be adequately alleged to have purposefully pursued a course of action or inaction that he or she considered would probably result in the harm to Plaintiffs.

Here, the Sheriff Defendants' alleged conduct involves actions and omissions. The Defendants responded to the Brown's complaint, met or talked with the Browns on three occasions, attempted unsuccessfully to access the Web site page, forwarded the report of the Brown's police complaint to Deputy Gardner, and consulted the bomb squad about the Web site's references to the pipe bombs. It appears that the Jefferson County Sheriff's Department investigators attempted, unsuccessfully, to link the pipe bomb information to pipe bomb activity in the area. *See* C/O Attachment A. Thus, the Sheriff Defendants took action addressing the Web site's specific information.

The information contained in the Web site information is vague and rambling. Harris expresses his wish to blow up a downtown area in a big city. He writes that he lives in Denver and that he "would love to kill almost all of its residents." In the same paragraph, he specifies that people with "rich snobby attitude," "fitness fuckheads," and people who pay taxes would be his most likely targets. *See* C/O Exhibit A. There is, no mention of Columbine High School or its student body. The information later added to the Web site adds little. These three pieces of information are not linked together or to the prior Web site information. The April 20th reference and the personal quote are cryptic

and Harris' reference to Columbine is not menacing or threatening.

■ Plaintiffs fairly argue that there was more that the Sheriff Defendants could have done to investigate Harris' and Klebold's actions. While true, in light of the vague, diffuse, rambling nature of Harris' writings, and the lack of results garnered by the investigation, I conclude that the Sheriff Defendants' actions or omissions, while possibly negligent or arguably grossly negligent, do not constitute willful and wanton conduct sufficient to abrogate governmental immunity under Colorado law. *See* Colo.Rev.Stat. § 13–21–102(1)(16); *Moody,* 885 P.2d 200; *Pettingell,* 271 P.2d 1038.

In later addressing Claim Two against Deputy Gardner, I conclude that Plaintiffs have alleged conduct on his part that was reckless in conscious disregard of risk to Plaintiffs. That conclusion arguably negates his entitlement to immunity under the CGIA. I will assume it does. *See infra,* section (V)(B)(2)(d). Consequently, for purposes of further analysis I conclude Plaintiffs' Claim One is barred by the Colorado Governmental Immunity Act as to all Sheriff Defendants except Defendant Gardner.

### 2. Fed.R.Civ.P. 12(b)(6) Motion to Dismiss

In the alternative, the Sheriff Defendants move to dismiss Claim One on the grounds that there is no cognizable claim under Colorado law for failure to forecast or prevent a crime. In response, Plaintiffs contend that the Sheriff Defendants owed a duty to Richard Castaldo and the other Columbine High School students, as members of the public, to protect them from harm by investigating adequately reports of impending criminal activity in light of the seriousness of the potential harm presented in the reports. *See* C/O ¶ 62. In Plaintiffs' view, this duty arose from special relationships that existed, collectively, among the School, the Sheriff Defendants, Harris and Klebold, and the Columbine victims. *See* Response Brief, p. 38.

In viewing these relationships collectively, Plaintiffs in essence attempt to blend their response to Claim One against the Sheriff Defendants and Claim Four against the School Defendants. Even so, I analyze independently the claims against each set of Defendants.

■ Guiding principles have emerged from Colorado cases addressing whether police officers owe a duty to crime victims who are injured by third parties. Generally, there is no duty to prevent a third person from harming another unless a special relationship exists between the defendant and the wrongdoer or between the defendant and the victim. *Leake v. Cain,* 720 P.2d 152 (Colo.1986) *citing* Restatement (Second) of Torts § 315. *See also Solano v. Goff,* 985 P.2d 53 (Colo.App. 1999).

#### a. Special relationship

Pursuant to *Leake* and its progeny, under Colorado law a special relationship giving rising to a legal duty of care has been confined to circumstances where: 1) a citizen, either perpetrator or victim, was in the custody or control of the police under circumstances giving rise to a duty of care, *Leake,* 720 P.2d at 163; 2) law enforcement officers' actions created reasonable reliance on the part of the victims that the police would assist or protect them, *Whitcomb v. City and County of Denver,* 731 P.2d 749 (Colo.App.1986); or 3) there is a statutory duty of care; *see Leake,* 720 P.2d at 162; *Dare v. Sobule,* 674 P.2d 960 (Colo.1984).

#### i. Custody or Control over Plaintiffs or Harris and Klebold

■ There are no allegations of a prior relationship between the Plaintiffs and any

of the Sheriff Defendants. Plaintiffs' complaint contains no allegations that at the time of the attack or at any time before the attack, the Sheriff's Department or the individual Sheriff Defendants had custody or control over Harris and Klebold. Thus, there was no custody or control by the Sheriff's Department over the Plaintiffs or Harris and Klebold.

In their Response Brief, Plaintiffs refer to Harris' and Klebold's previous arrest by the Sheriff Defendants and the fact that they were on probation as grounds for finding a special relationship between Harris and Klebold and the Sheriff Defendants. I disagree.

Harris and Klebold were arrested for a property crime, prosecuted by the Jefferson County District Attorney's Office, and assigned to a state-administered probation department for oversight under the Juvenile Diversion Program. Moreover, none of the Sheriff Defendants are alleged to have: 1) been responsible for supervising Harris and Klebold during their participation in this diversion program; or 2) had any contact with them during this time.

Under these circumstances, I conclude that the Sheriff Defendants had neither custody of nor exercised any control over Harris, Klebold, or the Columbine victims, including Richard Castaldo. Therefore, there was no special relationship among any of these persons.

## ii. Reliance or Creation or Enhancement of Peril

Plaintiffs do not allege that the Sheriff Defendants created or enhanced the danger to the victims, including Richard Castaldo, faced from Harris and Klebold. Rather, Claim One is grounded solely in the "special relationship" circumstance that may give rise to a legal duty of care in Colorado. *See* C/O ¶¶ 64–66. There is no

basis to conclude there was a special relationship based on this theory.

### iii. *"in loco parentis"*

In a novel approach, Plaintiffs argue that the Sheriff Defendants, through Deputy Gardner as school resource officer, had a special relationship with the Columbine students, including Richard Castaldo, pursuant to the *"in loco parentis"* doctrine. *See* C/O ¶ 64. Plaintiffs contend further that through Deputy Gardner's alleged special relationship with the Columbine students, and the other Sheriff Defendants' opportunity to interact with Deputy Gardner concerning information regarding Harris and Klebold, the other Sheriff Defendants shared this relationship with and owed a similar duty to the Columbine High School students. *Id.* at ¶ 66. I disagree.

According to Plaintiffs where, as here, there is a law enforcement presence on campus the school resource officer becomes part of the school-student relationship. *See State v. Angelia D.B.,* 211 Wis.2d 140, 564 N.W.2d 682 (1997); *In the Matter of Josue T.,* 128 N.M. 56, 989 P.2d 431 (1999); *People v. Dilworth,* 169 Ill.2d 195, 214 Ill.Dec. 456, 661 N.E.2d 310 (1996). Plaintiffs argue that the School Defendants share a special relationship with the Columbine High School students leading to "duties to protect students in their custody from foreseeable harm" under the doctrine of *"in loco parentis."* *See* Response Brief, p. 39. Plaintiffs seek to graft this alleged relationship onto Deputy Gardner, and through him, to the other Sheriff Defendants. *See id.*

The phrase *"in loco parentis"* means "[i]n the place of a parent". Black's Law Dictionary 403 (5th ed.1983). By this common law doctrine, a parent " 'may … delegate part of his parental authority, during his life, to the tutor or schoolmaster of his child; who is then *in loco parentis,*

and has such a portion of the power of the parent committed to his charge, viz. that of restraint and correction, as may be necessary to answer the purposes for which he is employed.'" *Vernonia Sch. Dist. 47J v. Acton* 515 U.S. 646, 655, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) *quoting* W. Blackstone, Commentaries on the Laws of England 441 (1769). The genesis of the *in loco parentis* doctrine in the school setting is mandatory school attendance law. *See, e.g., Armijo v. Wagon Mound Pub. Sch.,* 159 F.3d 1253, 1261 (10th Cir.1998); *Wyke v. Polk County Sch. Bd.,* 129 F.3d 560, 569 (11th Cir.1997); *Dorothy J. v. Little Rock Sch. Dist.,* 7 F.3d 729, 732 (8th Cir.1993); *D.R. v. Middle Bucks Area Vocational Technical Sch.,* 972 F.2d 1364, 1370–73 (3d Cir.1992) (en banc), *cert. denied,* 506 U.S. 1079, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993); *J.O. v. Alton Community Unit Sch. Dist. 11,* 909 F.2d 267, 272–73 (7th Cir.1990).

According to this theory, while students are present at school by mandatory attendance law, the school steps into the role of the parent, becoming *"in loco parentis."* Under the *in loco parentis* doctrine, the school officials are said to have a duty to act reasonably to protect students from foreseeable harm while on school grounds.

 Plaintiffs' argument fails for two reasons. First, the Tenth Circuit has consistently held without reference to the *"in loco parentis"* doctrine that compulsory attendance laws do not create an affirmative constitutional duty for school officials to protect students from private harm while attending school. *See DeAnzona v. City & County of Denver,* 222 F.3d 1229, 1234 (10th Cir.2000); *Graham v. Independent Sch. Dist. No. I–89,* 22 F.3d 991 (10th Cir.1994); *Maldonado v. Josey,* 975 F.2d 727, 732 (10th Cir.1992), *cert. denied,* 507 U.S. 914, 113 S.Ct. 1266, 122 L.Ed.2d 662 (1993). *See* Section (V)(B)(1), *infra,* for analysis of these cases.

Second, Plaintiffs do not cite, and research fails to reveal, any authority applying the *in loco parentis* doctrine to law enforcement entities or personnel. Instead, Plaintiffs cite three search and seizure cases from foreign jurisdictions. *See Angelia D.B.,* 211 Wis.2d 140, 564 N.W.2d 682 (1997). *In the Matter of Josue T.,* 128 N.M. 56, 989 P.2d 431 (1999); *Dilworth,* 169 Ill.2d 195, 214 Ill.Dec. 456, 661 N.E.2d 310 (1996).

Significantly, these three cases involved law enforcement officers acting with or at the behest of school officials so that they were acting on behalf of or in place of the school officials. These cases do not, however, rest their holdings on the *in loco parentis* doctrine or impose the responsibilities of an *in loco parentis* relationship upon the involved police agency. Accordingly, I conclude that the Sheriff Defendants were not in a special relationship with the Plaintiffs based on the *"in loco parentis"* doctrine.

#### b. *Solano* Factors

Claim One fails assuming a special relationship.

In *Solano,* 985 P.2d 53, the Court listed factors to be examined to determine the existence of a duty in situations where special relationships exist: 1) the foreseeability of harm to others; 2) the social utility of the defendant's conduct; 3) the magnitude of the burden of guarding against injury or harm; and 4) the practical consequences of placing such a duty upon the police. *Id.* at 54.

The *Solano* court concluded that the county sheriff owed no legal duty to the surviving heirs of a man murdered by an inmate who had escaped from the county jail. *Solano,* 985 P.2d 53. In determining that no duty of care existed, the *Solano* Court assumed the existence of a special relationship between the sheriff and the

inmate. This was but the threshold consideration. The Court then analyzed and balanced each of the other factors before concluding that there was no legal duty. In reaching its conclusion, the Court noted that while foreseeability was an important factor, "foreseeability by itself does not establish the existence of a legal duty." *Id.* at 54 *citing Perreira v. State,* 768 P.2d 1198 (Colo.1989).

### i. Foreseeability of Harm

 The question of foreseeability " 'includes whatever is likely enough in the setting of modern life that a reasonably thoughtful person would take account of it in guiding practical conduct.' " *Taco Bell, Inc. v. Lannon,* 744 P.2d 43, 48 (Colo.1987) *quoting* 3 F. Harper, F. James, & O. Gray, The Law of Torts § 18.2 at 658–59 (2d ed.1986). Evidence of past similar acts is sufficient to find that such acts in the future are foreseeable. *See, e.g., Taco Bell,* 744 P.2d at 48 (evidence of ten armed robberies at particular Taco Bell restaurant in three years sufficiently established that harm to customers as result of criminal acts by third persons was foreseeable by Taco Bell); *Cohen v. Southland Corp.,* 157 Cal.App.3d 130, 203 Cal.Rptr. 572, 576–77 (Cal.App.4 Dist.1984) (evidence of one prior armed robbery at a 7–Eleven store together with evidence of more than one robbery per store per annum at other 7–Elevens in the area sufficient to make foreseeability a triable issue of fact). Simply because something has not yet happened, however, does not necessarily negate foreseeability. *Taco Bell,* 744 P.2d at 48. Instead, foreseeability is based on common sense perceptions of the risks created by various conditions and circumstances. *Solano,* 985 P.2d at 54 *citing Taco Bell,* 744 P.2d at 48. *See also,* Restatement (Second) of Torts § 289 (1965).

 Again, while important, foreseeability alone does not establish the existence of a legal duty. *Solano,* 985 P.2d at 54; *Perreira,* 768 P.2d 1198; *Taco Bell,* 744 P.2d at 49; *Restatement (Second) of Torts* § 344, comment f (1965).

Plaintiffs allege that the events of April 20, 1999 were foreseeable based on the contents of: 1) the Web site; 2) the videotapes created during classes at Columbine High School; 3) a writing assignment turned in by Dylan Klebold in School Defendant Kelly's creative writing class; *see* Exhibit B; and 4) various writings and discussions in school presentations. *See* Response Brief, p. 41.

### a. Web site

 I have reviewed the Web site pages attached and incorporated into Plaintiff's Complaint. *See* Exhibit A. These pages consist of rambling, obscene, non-specific diatribes against various groups: 1) mall patrons who walk slowly; 2) people who stand in the middle of hallways and will not move; 3) "stupid" people; 4) Jon Benet Ramsey; 5) people who don't understand computers; 6) people who cut in lines; 7) liars; 8) weather forecasters; 9) those who think wrestling is real; 10) young smokers; 11) racists; 12) people who don't believe in personal hygiene; 13) Star Wars fans; 14) phone solicitors; and 15) people who mispronounce words. *See id.*

The pages also contain descriptions of the construction and detonation of pipe bombs. While clearly disturbing, no specific target is discernable from these unfocused writings.

The Web site pages contain a single express threat against the life of Brooks Brown. The threat is not expressed in the context of Brown's status as a Columbine student. Indeed, Columbine High School and its students are not mentioned. *See* Exhibit A. The only reference to school contained in the Web pages is: "YOU

KNOW WHAT I LOVE?—SCHOOL' (sic) YOU KNOW WHAT I HATE?—SCHOOLWORK!" See id.

This content does not forecast the Columbine attack.

### b. classroom videos

In a video production class at Columbine High School taught by School Defendant Talocco, Harris presented a videotape depicting himself and Klebold enacting revenge shootings on other Columbine students. The video was filmed at Columbine and the actors used fake guns. C/O ¶ 152. Other videos presented by Harris and Klebold in this class showed them carrying guns, presumably fake, down the school hallways, C/O ¶ 153, and computer graphics of the school exploding. Id. at ¶ 154. School Defendant Talocco also viewed a video showing Harris and Klebold firing real guns. C/O ¶ 156. In addition, Columbine High School's video lab contained a video recorded in the mountains showing Harris firing a shotgun and Klebold shooting a TEK–9, apparently two of the weapons used in the April 20, 1999 attack. C/O ¶ 159.

Plaintiffs allege that Deputy Gardner knew or should have known of the information contained in these video tapes. See C/O ¶ 74. When the contents of these videotapes are coupled with the information contained on the Web site, the seriousness of the Web site threats become apparent and the focus of Harris' and Klebold's rage emerges—Columbine High School and their fellow students.

Based on these two sources of information, the foreseeability factor weighs in favor of imposition of a duty on Deputy Gardner—the only individual Sheriff Defendant alleged to have had knowledge of this information. See C/O ¶¶ 73–74.

### c. Klebold's creative writing assignment

Attached to and incorporated into Plaintiffs's Complaint is a creative writing assignment Klebold submitted in School Defendant Kelly's class. See C/O Exhibit B. This violent story, related by an anonymous third person observer, concerns a man dressed in a long black trench coat carrying a duffel bag and armed to the hilt who approaches a "popular bar" in the "center of the average-sized town." Id. After encountering nine "college-preps," outside of the bar, the man systematically slaughters all nine. Because the man detonated remotely placed explosive devises as a diversionary tactic, he is able to carry out his diabolical plan with impunity and avoid capture by the police. Id.

Plaintiffs characterize Klebold's story as "frightening[ly] similar[ ] to the actual attack..." As chilling and vicious as it is, the story does not forecast an attack on Columbine High School. The story takes place at 1:00 a.m. outside of a bar in an unnamed "average size town." The assailant is described as a "man," not a high school student. The tenor of the writing supports this description as well. Moreover, the story contains no references to Columbine, specifically, or any other school. Based on this document alone, the Columbine High School attack was not foreseeable.

### d. various writings and discussions in school presentations

It is alleged that in psychology and creative writing classes, Harris and Klebold produced writings describing or demonstrating "some or all of the following: their hatred, anger, possession of firearms, and desire and intent to kill and injure others, including Columbine students." C/O ¶¶ 160, 163. In one of Harris' assignments, he wrote his story from the per-

spective of a shotgun shell. C/O ¶ 162. Harris also wrote that as a child, he liked to pretend he was shooting people. *Id.*

These allegations present a mixed picture as to foreseeability. As to Harris' story from the view of a shotgun shell, there is nothing specifically predictive about this writing. Similarly, his writing that as a child he liked to pretend he was shooting people is disturbing but not predictive.

The generally described writings containing expressions of Harris' and Klebold's "hatred, anger, possession of firearms, and desire and intent to kill and injure others, including Columbine students," *see* C/O ¶¶ 160, 163, weigh in favor of imposition of a duty on Deputy Gardner. I conclude that Deputy Gardner's alleged knowledge of the Web site information and the information known to each of the School Defendant teachers weighs in favor of imposing a duty on him. *See* C/O ¶ 74. Because there are no similar allegations as to the other Sheriff Defendants, this factor weighs against imposing a duty on them.

#### ii. Social Utility of Law Enforcement

The second factor is the social utility of the individual Sheriff Defendants' conduct. In arguing that this factor does not favor the Sheriff Defendants, Plaintiffs point to alleged specific instances of misconduct. This approach misapprehends the nature of this analysis. The appropriate inquiry is to assess the social utility of the Sheriff's Department's conduct as a whole. *See Davenport v. Community Corrections,* 962 P.2d 963 (Colo.1998), *cert. denied,* 526 U.S. 1068, 119 S.Ct. 1462, 143 L.Ed.2d 547 (1999).

In *Davenport,* a community corrections resident sentenced on a burglary conviction had a history of alcohol abuse. While in defendant's facility, he had a series of drug and alcohol related infractions. Despite these infractions, he was granted a weekend pass during which he was involved in a car accident in which Davenport was seriously injured. In assessing the social utility factor, the Court considered the function and purpose of community corrections as a whole, including such aspects as sentencing options, rehabilitation prospects, positive impact on victim restitution, and fiscal savings. *See Davenport,* 962 P.2d at 968–69.

The social utility of the Sheriff's Department's function and purpose and, by extension, the Sheriff Defendants is high. Their mission is to keep the peace to the best of their abilities and to protect the public so that the citizenry can live and work in a relatively safe world. *See Solano,* 985 P.2d at 55. In this case imposition of a duty would undermine the Sheriff's Department's high social utility by establishing real disincentive to act. This factor weighs against imposition of a duty.

#### iii. magnitude of the burden of guarding against injury or harm

Plaintiffs see the burden on the Sheriff Defendants as slight. In contrast, the Sheriff Defendants view the burden as immense, "requiring police officers to follow every single reasonable and unreasonable lead, investigate every complaint, and make predictions about human behavior" Sheriff Defendants' Brief, p. 23.

The Sheriff Defendants' burden is not as onerous as they describe. Imposition of the burden of investigating a legitimate complaint is no more than that which is expected as a normal course of action. However, it is speculative to say that a proper investigation of the Web site printout would have led to prevention of the Columbine tragedy. As I stated, there is nothing in the Web site information linking Harris' diatribes to Columbine High School or the student body. Moreover, the Browns'

complaint was lodged thirteen months before the attack.

There is no statutory or case precedent charging law enforcement officers with the duty of predicting violent acts. Indeed, pursuant to Colo.Rev.Stat. § 13–21–117 (1987), Colorado mental health professionals including psychiatrists, psychologists, and psychiatric nurses, are exempt from civil liability for damages for failure to warn or protect any person against a mental health patient's violent behavior. It further exempts mental health care providers from civil liability for failure to predict such violent behavior, "except where the patient has communicated to the mental health care provider a serious threat of imminent physical violence against a specific person or persons." *See id.* The law should not impose a higher duty on law enforcement officers than that expected of mental health professionals who routinely deal with such issues.

Moreover, if I were to apply the standard in § 13–21–117 to the information known to the Sheriff Defendants the threats, while serious, could not be deemed imminent and were not directed against anyone except Brooks Brown. He is not a party to this action. Under these circumstances, this factor weighs against imposing a legal duty.

### iv. practical consequences of imposing a duty

As discussed in *Solano,* imposing liability on the individual Sheriff Defendants for the conduct of third parties who have no violent history would render law enforcement officers insurers for such conduct. This would have inevitable negative consequences for all aspects of police work including investigations and arrests with real potential to significantly undermine effective law enforcement. Indeed, the spectre of personal liability in the circumstances here creates a disincentive to even enter law enforcement. Because these consequences would detrimentally affect the public, this factor also weighs against imposing a legal duty.

In summary, even assuming a requisite special relationship, consideration of the relevant factors, under the circumstances alleged here, leads to the conclusion that imposition of a legal duty on the Sheriff Defendants, including Deputy Gardner, is not warranted.

### c. Statutory Duty

In the alternative, Plaintiffs contend that Colo. Rev. Stats. §§ 30–10–515 and 506 create a duty on the part of the sheriffs "to take seriously and follow through to investigate threats to the peace of Jefferson County for the protection of its residents." Response, p.37. *See also,* C/O ¶ 108. These statutory sections provide, in pertinent part:

§ 30–10–516. **Sheriffs to preserve peace—command aid**

It is the duty of the sheriffs, undersheriffs, and deputies to keep and preserve the peace in their respective counties, and to quiet and suppress all affrays, riots, and unlawful assemblies and insurrections....

§ 30–10–506. **Deputies—liability of sheriff**

Each sheriff may appoint as many deputies as he may think proper, for whose official acts and those of his undersheriff he shall be responsible, and may revoke such appointments at his pleasure. Persons may also be deputized by such sheriff or undersheriff in writing to do particular acts; the sheriff and his sureties shall be responsible on his official bond for the default or misconduct of his undersheriff and deputies.

The Sheriff Defendants agree their mission is to enforce the law, investigate po-

tential criminal activities, make arrests, and aid the prosecution of various criminal activities as appropriate. *See* Sheriff Defendants' Reply Brief, p. 13. This mission does not mean, however, that the Sheriff Defendants are liable for the acts of violence perpetrated by Harris and Klebold.

The Colorado Supreme Court has held that in the absence of a clear expression of intent to create a tort remedy, a statute cannot be the basis of a tort claim against a public entity or official. *See Board of County Comm'rs v. Moreland,* 764 P.2d 812 (Colo.1988); *Quintano v. Industrial Comm'n,* 178 Colo. 131, 495 P.2d 1137 (1972).

 While § 516 and § 506 define generally the powers and duties of the county sheriff and subordinates, they do not create an actionable legal duty upon which they can be sued. Section 30–10–506 provides that a county sheriff is liable for the tortious acts of his or her subordinates but does not by itself create a duty to act. Accordingly, nothing in § 30–10–506 indicates an intent to create an actionable duty or form the basis of a tort claim against the sheriff.

No Colorado court has held that violation of § 30–10–516 creates an actionable tort. A nearly identical statute, Colo.Rev. Stat. § 31–4–112 provides that chiefs of police have powers and duties similar to those applicable to county sheriffs. Nowhere in *Leake, Whitcomb, Potter* or any other case have the Colorado courts held that § 31–4–112 or any other statute or regulation regarding law enforcement officers create a duty to act.

By their plain terms, neither § 30–10–506 nor § 30–10–516 contain any expression of intent to create a tort remedy. Therefore, as a matter of law, no action for willful and wanton conduct may be brought against the Sheriff Defendants based on these statutes. *See Moreland,* 764 P.2d

812 (Colo.1988); *Quintano,* 178 Colo. 131, 495 P.2d 1137.

In the absence of a duty, the Sheriff Defendants are entitled to dismissal of Claim One.

**B.** ***Claim Two*—42 U.S.C. § 1983 Deprivation of right to life, liberty, and personal security—against individual Sheriff Defendants, except the Sheriff's Department—failure to investigate—based on creating or substantially enhancing the danger faced by Plaintiffs—special relationship—duty to protect Columbine High School students**

The Sheriff Defendants move to dismiss Claim Two in which Plaintiffs assert a substantive due process violation based on alleged improper investigative efforts by Defendants. For the following reasons, I grant the motion.

The Fourteenth Amendment of the United States Constitution explicitly guarantees to each citizen that no state shall "deprive any person of life, liberty, or property, without due process of law ...." U.S. Const., amend. XIV, § 1. The Due Process Clause of the Fourteenth Amendment guarantees the right of appropriate procedural process, not implicated in this case, before a state can act to deprive an individual of his or her life, liberty, or property. The Fourteenth Amendment also contains a judicially recognized substantive due process component that protects an individual's life, liberty and property against "certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

Violation of substantive due process rights pursuant to the Fourteenth Amendment of the U.S. Constitution is remedied through 42 U.S.C. § 1983:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

This section, enacted in its original form in 1871, was specifically designed to provide a means for redress of violations of the rights protected under the Fourteenth Amendment by *state actors*. As described by the United States Supreme Court, § 1983 developed in the following manner:

As a result of the new structure of law that emerged in the post-Civil War era—and especially of the Fourteenth Amendment, which was its centerpiece—the role of the Federal Government as guarantor of basic federal rights against state power was clearly established.... Section 1983 opened the Federal Courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation.

\* \* \* \* \* \*

The very purpose of § 1983 was to interpose the Federal Courts between the states and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.'

*Mitchum v. Foster*, 407 U.S. 225, 238–40, 242, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972). ▮▮▮▮▮· While implemented to provide a means of redress for the deprivation of life, liberty or property by state action, neither § 1983 nor the Fourteenth Amendment transform mere torts into constitu-

tional violations. *Daniels*, 474 U.S. at 332, 106 S.Ct. 662. Instead, the Fourteenth Amendment protects citizens from the arbitrary, abusive, or oppressive use of governmental power. *Id.* This basic principle of due process jurisprudence dictates that the Fourteenth Amendment does not confer an "affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).

In *DeShaney*, the Supreme Court announced the now firmly entrenched rule that the Due Process Clause of the Fourteenth Amendment does not impose a constitutional duty upon a state to protect individuals from private violence. *See id.* at 195–97, 109 S.Ct. 998. The Winnebago County Department of Social Services (the County) received numerous reports that Joshua, a small child, was being abused by his father. *Id.* at 192–93, 109 S.Ct. 998. Joshua, temporarily removed from his father's custody, was soon returned to his father's care. *Id.* The County continued to receive reports that Joshua was being abused but failed to act. *Id.* Eventually, Joshua's father beat him so severely that he suffered permanent brain damage. *Id.* Joshua and his mother sued the County and several of its employees, alleging that the County had violated the Substantive Due Process Clause of the Fourteenth Amendment by failing to intervene on his behalf and protect him from his father's abuse. *Id.*

The *DeShaney* Court rejected plaintiffs' argument that the County acquired an affirmative obligation to protect Joshua from his father's abuse based on the fact that the County was aware of the alleged abuse. *Id.* at 195, 109 S.Ct. 998. Relying

on the premise that the purpose of the Due Process Clause is "to protect the people from the State, not to ensure that the State protects them from each other," the Court held that:

> [N]othing in the Due Process Clause itself requires a State to protect the life, liberty, and property of its citizens against invasions by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.... Consistent with these principles, ... the Due Process Clause[ ] generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty or property interests of which the government may not deprive the individual.

*Id.* at 195–96, 109 S.Ct. 998. The principle that there is no constitutional right to police protection is derived from well settled jurisprudence addressing the purposes of the Fourteenth Amendment and 42 U.S.C. § 1983, the statutory provision providing a remedy for violations of the Constitution.

The Tenth Circuit has gleaned two exceptions to *DeShaney's* general rule that a state is not constitutionally obligated to protect individuals against private violence: 1) the special-relationship doctrine, and 2) the state-created or enhanced danger doctrine. *See Uhlrig v. Harder,* 64 F.3d 567, 572 (10th Cir.1995).

The special-relationship doctrine stems directly from *DeShaney* itself, and applies in situations where the state imposes limitations upon an individual's freedom to act on his or her own behalf:

> It is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, *or other similar restraint of personal liberty*—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

*DeShaney,* 489 U.S. at 200, 109 S.Ct. 998 (emphasis added); *see also City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (duty to provide medical care to injured suspects in police custody); *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28(1982) (duty to protect involuntarily committed mental patients from harm by themselves and others).

In the years following *DeShaney,* courts have struggled with the question of what restraint "similar" to incarceration or institutionalization is sufficient to give rise to a state's duty to protect. The Tenth Circuit has held that a plaintiff must show involuntary restraint by a government official in order to establish a duty to protect under the special relationship theory. *See Liebson,* 73 F.3d at 276 (librarian who was sexually assaulted while employed in a prison failed to show existence of special relationship because employment was voluntary).

Significantly, in *Graham,* 22 F.3d at 994–95, the Tenth Circuit held that schools have no duty under the Due Process Clause to protect students from assaults by other students, even when the school knew or should have known of the danger presented. If the state takes a person into custody or holds him against his will the state assumes some measure of a constitutionally mandated duty of protection. *Id.* at 994. Compulsory attendance laws for public schools, however, do not

create an affirmative constitutional duty to protect students from the private actions of third parties while they attend school. *Id., citing Maldonado,* 975 F.2d at 732. Inaction by the state in the face of a known danger is not enough to trigger a constitutional duty to protect unless the state has a custodial or other "special relationship" with the victim. *See Graham,* 22 F.3d at 995 *citing Reed v. Gardner,* 986 F.2d 1122, 1125 (7th Cir.), *cert. denied,* 510 U.S. 947, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993). "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament ... but from the limitation which it has imposed on his freedom to act on his own behalf." *De-Shaney,* 489 U.S. at 200, 109 S.Ct. 998; *Seamons v. Snow,* 84 F.3d 1226, 1235–36 (10th Cir.1996), *rev'd, in part, on other grounds,* 206 F.3d 1021 (10th Cir.2000). Moreover, a defendant's knowledge of the risk of harm is not relevant to the determination of whether a special relationship existed. *See Graham,* 22 F.3d at 994. ("foreseeability cannot create an affirmative duty to protect" under the special relationship doctrine "when plaintiff remains unable to allege a custodial relationship").

In its reasoning, the *DeShaney* Court also planted the seed for the second exception to the general rule that the state has no duty to protect citizens from private violence. This is known as the state-created or enhanced danger doctrine:

> While the State may have been aware of the dangers that Joshua faced in the free world, *it played no part in their creation, nor did it do anything to render him any more vulnerable to them.* *DeShaney,* 489 U.S. at 201, 109 S.Ct. 998 (emphasis added).

The courts have also grappled with the question of what state conduct "creates or enhances" danger sufficient to establish a duty to protect. In *Medina v. City and County of Denver,* 960 F.2d 1493, 1495–99 (10th Cir.1992), the Tenth Circuit explained that police officers who engaged in a high speed car chase that resulted in injuries to a bicyclist could be liable for creating a special danger faced by the bicyclist.

The Tenth Circuit also addressed directly the state-created or enhanced danger doctrine in *Graham,* 22 F.3d 991, concerning acts of violence at two schools. At one school, a student was shot and killed by another student. At the other school, a student was stabbed by a fellow student. The students' parents brought separate § 1983 actions against their respective School Districts which were consolidated on appeal.

The *Graham* Court noted that "*DeShaney* ... le[ft] the door open for liability in situations where the state creates a dangerous situation or renders citizens more vulnerable to danger," *citing Reed,* 986 F.2d at 1125 and *Dwares v. City of New York,* 985 F.2d 94, 99 (2nd Cir.1993). Citing *L.W. v. Grubbs,* 974 F.2d 119, 121 (9th Cir.1992), *cert. denied,* 508 U.S. 951, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993), the *Graham* Court stated that "[this state-created danger doctrine] necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger." *Graham* at 995. Based in part on the plaintiffs' failure to point to any affirmative actions by defendants that created or increased the danger to the victims, *Graham* affirmed the district court's dismissal of the plaintiffs' complaints.

The contours of this doctrine were further explored in *Uhlrig v. Harder,* 64 F.3d 567 (10th Cir.1995) in which the husband of a therapist killed by a mental hospital patient filed a § 1983 action asserting that the state's decision to terminate a special forensics unit created the danger that led to his wife's death. The *Uhlrig* Court

articulated a five-part test to determine whether a defendant created or enhanced the danger for a plaintiff: 1) whether plaintiff was a member of a limited and specifically definable group; 2) whether defendant's conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; 3) whether the risk to plaintiff was obvious or known; 4) whether defendant acted recklessly in conscious disregard of that risk; and 5) if such conduct, when viewed in total, "shocks the conscience" of federal judges. *Id.* at 571.

To bring the *Uhlrig* test in line with *DeShaney,* the Tenth Circuit later held in *Armijo v. Wagon Mound Public Schools,* 159 F.3d 1253 (10th Cir.1998) that "in addition to meeting *Uhlrig's* five-part test, a plaintiff must also show that the charged state entity and the charged individual defendant actors created the danger or increased ... the danger in some way." *Id.* at 1263; *accord Sutton v. Utah State Sch. for the Deaf & Blind,* 173 F.3d 1226, 1238 (10th Cir.1999) (noting that danger-creation theory "necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger").

I address Claim Two in light of these controlling legal principles.

Plaintiffs allege that the individual Sheriff Defendants failed to: 1) adequately investigate Mr. and Mrs. Brown's March 1998 complaint that Harris and Klebold were threatening violence toward their son Brooks Brown; and 2) monitor or intervene in Harris' and Klebold's actions after March 1998 to prevent the attack on Columbine High School.

**1. Special Relationship Between the Sheriff Defendants and the Plaintiffs**

Plaintiffs allege that:

[a] special relationship existed between all of the Sheriff Defendants, including but not limited to Defendant Gardner, as the School Resource Officer at Columbine High School, and the students of Columbine High School. This relationship ... arise[s] from the nature of the threatened harm, its association with Columbine High School, the probationary status of Harris and Klebold, the vulnerability of innocent students such as Richard R. Castaldo, and other surrounding circumstances....

C/O ¶ 121.

Plaintiffs do not allege any restraint of their liberty by the Sheriff Defendants. Rather, their Complaint focuses upon the events occurring prior to April 20,1999.

 Plaintiffs' argument that a special relationship existed emerges only from the Plaintiffs' relationship to Columbine High School. Hence, the basis for the alleged special relationship with the Sheriff Defendants appears to rest entirely on Deputy Gardner's relationship to Columbine High School through his role as school resource officer and, by extension, through him to the other Sheriff Defendants. As I said, under Colorado state law, this role cannot support a special relationship. *See* section (5)(A)(2)(a)(iii), *supra.* As a matter if federal constitutional law, the result is no different.

 The Tenth Circuit has repeatedly held that compulsory attendance laws do not create an affirmative constitutional duty for school officials to protect students from private harm while attending school. *See e.g., Maldonado,* 975 F.2d at 732. Indeed, schools have no duty under the Fourteenth Amendment's due process clause to protect students from assaults by other students, even when the school knew or should have known of the danger presented. *See Graham,* 22 F.3d at 995. An affirmative duty to protect arises only when the state "so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human

needs .... " *DeShaney,* 489 U.S. at 200, 109 S.Ct. 998; *DeAnzona,* 222 F.3d at 1234.

Plaintiffs attempt to distinguish Tenth Circuit precedent to establish a duty to protect attributable to school officials and, by extension, to the Sheriff Defendants. They also rely on Supreme Court and Tenth Circuit authority addressing Title IX liability of school districts.

In *Graham,* the Tenth Circuit dealt squarely with the issue of whether a special relationship arises from school attendance and requires the school to protect students from harm caused by other students. The plaintiff filed a § 1983 action against the school district alleging that another student shot and killed her son while he was in the school district's care and custody. Ms. Graham alleged that the school district employees had received warnings of threatened violence against her son and that the school district failed to take appropriate measures to protect him. Nonetheless, following *DeShaney,* after considering the alleged foreseeability of the danger, the Tenth Circuit held that there was no special relationship or constitutional violation because the plaintiff's son was killed by private actors. *Id.*

The *Graham* court acknowledged that while students might become the victims of school violence, the Constitution does not provide an avenue of redress:

> We are poignantly aware of the seeming transformation of our public schools from institutions of learning into crucibles of disaffection marred by increasing violence from which anguish and despair are brought to homes across the nation. Yet, defendant school districts neither entered into a custodial relationship with their students, nor did they create or augment the danger posed by the aggressors. Therefore, as the law unquestionably mandates, we affirm the district court's orders dismissing plaintiffs' claims.

*Graham,* 22 F.3d at 992.

The Plaintiffs' remaining attempts to establish a special relationship rely on dissents in *D.R. by L.R. v. Middle Bucks Area Vocational Tech.,* 972 F.2d 1364 (3rd Cir.1992) and *Johnson v. Dallas Indep. Sch. Dist.,* 38 F.3d 198 (5th Cir.1994), and decisions addressing Title IX liability for school districts in *Davis v. Monroe County Bd. of Education,* 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) and *Murrell v. School Dist. No. 1,* 186 F.3d 1238 (10th Cir.1999). Both the majority decisions in *D.R.* and *Johnson* held that there was no special relationship between students and the schools. The decisions in *Davis* and *Murrell* do not address the appropriate inquiry of duty under the Fourteenth Amendment. *Davis* and *Murrell* address liability pursuant to Title IX, which proscribes discrimination on the basis of gender. *See* 20 U.S.C. § 1681(a).

Plaintiffs argue that *DeShaney's* application to schools must be reassessed in light of the Supreme Court's interpretation of Title IX of the Education Amendments of 1972. The notion that the elements of a Title IX claim are transferable to a Due Process Claim impermissibly presumes that a statute can amend the U.S. Constitution. While *Davis* notes that schools may exercise "a degree of supervision and control [over students] that could not be exercised over free adults," it does so while relying on the very sentence from *Vernonia School Dist.,* 515 U.S. at 655, 115 S.Ct. 2386 stating that this degree of control does not give rise to a duty to protect. *See Davis,* 526 U.S. at 645, 119 S.Ct. 1661. *Davis* does not rest on a principle that public schools provide for their students' basic needs—the root of the holding in *DeShaney* and the Tenth Circuit decisions

drawn from *DeShaney*. *Davis* provides no basis to depart from controlling authority.

Under Tenth Circuit authority, school attendance does not create a special relationship between a student and a school district for purposes of imposing a constitutional duty. Consequently, there is no legal basis to impose a duty on Deputy Gardner through the School Defendants, or by extension, to the other Sheriff Defendants.

### 2. State Created or Enhanced Danger

Plaintiffs allege the following improper investigative efforts by the Sheriff Defendants created the danger the Plaintiffs faced:

> C/O ¶ 100: The Sheriff Defendants failed and refused . . . to:
>> d) report the contents of the Web site to school officials;
>> g) obtain permission from the parents and/or obtain a warrant and search the homes of Harris and Klebold, or conduct a warrantless search if appropriate;
>> i) file . . . appropriate criminal charges based on the contents of the Web site;
> C/O ¶ 85:[S]omeone in a position of authority in the JCSD, unknown to Plaintiffs, put a halt to the search warrant process and prevented a search warrant from being issued;
> C/O ¶ 86: Normal, routine paperwork which ordinarily would have been done to document the disposition of the investigation was either never completed or was removed from the JCSD file;

In addition, the Browns' follow up phone calls were not returned and, ultimately, Mrs. Brown was told not to call any more. C/O ¶ 88. According to Plaintiffs, these and other allegations support the inference that the investigation and follow-up was aborted for "ulterior motives not consistent with sound law enforcement practice." *Id.* at ¶ 93.

In moving to dismiss Claim Two, the Sheriff Defendants contend that Plaintiffs fail to allege circumstances or conduct sufficient to fulfill all five *Uhlrig* elements. *See* Sheriff Defendants' Brief, pp. 38–48. I agree.

### a. *Uhlrig* Test—First Element—Limited and Specifically Definable Group

The Sheriff Defendants argue the Plaintiffs were not members of a limited and specifically definable group known to the individual Sheriff Defendants prior to the Columbine High School attack. They evaluate this element in the context of the Web site information only. Plaintiffs' Response includes all of the information disclosed to the School Defendants over the ensuing year.

 As I have discussed, the Web site printout contains no references to Columbine High School or its student body. The one specific person threatened, Brooks Brown, was not linked to the school. This single identifiable threat was one among dozens of otherwise vague and rambling threats. Based on the Web site alone, this element of the *Uhlrig* test is not met. However, Harris' and Klebold's videotapes, writings, and statements demonstrate their desire, ability, and intent to harm Columbine students. This information, when viewed collectively, defines a limited and specific group—Columbine High School students.

The Complaint alleges that only Deputy Gardner knew, or should have known, the information known to the School Defendants. C/O ¶ 74. Thus, this element has been met as to Deputy Gardner only.

### b. *Uhlrig* Test—Second Element—Substantial Risk of Serious, Immediate and Proximate Harm

As an initial matter, Defendants contend that Plaintiffs failed to allege affirmative

acts on their part that put Plaintiffs at substantial risk of serious, immediate and proximate harm because Plaintiffs' allegations are limited to failures to act; i.e., failure to appropriately investigate Harris' and Klebold's activities. I do not view Plaintiffs' allegations so narrowly.

Plaintiffs allege that initial steps were taken to prepare and obtain a search warrant for the Harris residence but "someone in a position of authority in the JCSD, put a halt to the search warrant process and prevented a search warrant from being issued." C/O ¶ 85. At approximately the same time, Plaintiffs allege that "all follow-up on the [Browns'] report was apparently ceased. *Id.* at ¶ 86. Normal, routine paperwork which ordinarily would have been done to document the disposition of the investigation was either never completed or was removed from the JCSD file." *Id.* Splitting the semantic hair in Plaintiffs' favor, these alleged acts are arguably affirmative in nature as required by *Sutton,* 173 F.3d at 1238 (noting that danger-creating theory "necessarily involves affirmative conduct on the part of the state in placing the plaintiff in danger.").

In retrospect, the risk Richard Castaldo and the rest of the Columbine students faced was serious. More difficult for Plaintiffs is the requirement that the Sheriff Defendants must have affirmatively placed the Plaintiffs in harm's way. *See Armijo,* 159 F.3d at 1263.

In *Armijo,* the parents brought suit against a school and several individually named school employees when, after being suspended and driven home without parental notification, their son Philadelphio committed suicide. Plaintiffs' son, a special education student, repeatedly had expressed suicidal thoughts and at least one of the individual defendants knew that Philadelphio had access to firearms at his home. His suicide was immediately preceded by the decision of principal Mary

Schutz, and school counselor Tom Herrera, to suspend Philadelphio. Contrary to stated school policy, without contacting Philadelphio's parents, and despite his known suicidal ideation and access to firearms, Ms. Schutz directed Mr. Herrera to remove Philadelphio from the school grounds and drive him home, even though they both knew Philadelphio's parents were not home. Philadelphio shot himself at home after Mr. Herrera dropped him off and before his parents returned home. *See Armijo,* 159 F.3d at 1256–57.

In affirming the denial of summary judgment as to two defendants, the *Armijo* court emphasized that the defendants must have actually placed the boy in harms way, stating that:

> [t]he key to the state-created danger cases ... lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid. Thus the environment created by the state actors must be dangerous; they must know it is dangerous; and *to be liable, they must have used their authority to create an opportunity that would not otherwise have existed for the third-party's [acts] to occur.*

*Armijo,* 159 F.3d at 1263. (emphasis added). Furthermore, according to *Armijo,* "if the danger to the plaintiff existed prior to the state's intervention, then even if the state put the plaintiff back in that same danger, the state would not be liable because it could not have created a danger that already existed." *Id.*

 There are no allegations that any Sheriff Defendant other than Deputy Gardner was at Columbine High School between the date of the Browns' complaint and April 20, 1999. Nor are there any allegations upon which to infer that any

Sheriff Defendant, including Deputy Gardner, "used their authority to create an opportunity that would not otherwise have existed for [Harris' and Klebold's] acts to occur." *See Armijo,* 159 F.3d at 1263. At best, the allegations regarding the search warrant amount only to putting Plaintiffs back in the same danger faced before the Sheriff Defendants' intervention.

Thirteen months elapsed between the Browns' initial complaint and the Columbine attack. Harris and Klebold were not in the custody or control of the Sheriff Defendants during that time and neither was Richard Castaldo. The Columbine students, including Harris, Klebold, and Richard Castaldo, were free to go about their daily lives without interference from the Sheriff Defendants. The Sheriff Defendants played no part in who was present at Columbine on April 20th. Thus, they did not act affirmatively to place Plaintiffs in danger.

 Most importantly, the risk was not immediate or proximate. The term "immediate" means, "Present: at once, without delay; not deferred by any interval of time." *Black's Law Dictionary* 675 (1979) (Fifth Ed.) Similarly, the term "proximate" means, "Immediate, nearest; direct, next in order. In its legal sense, closest in causal connection." *Id.* at 1103. In addition, the risk must be of a limited range and duration, not merely that a person had the capacity or potential to act violently at some point in the future. *See Graham,* 22 F.3d at 995 *citing Reed,* 986 F.2d at 1127.

In light of the thirteen months that elapsed between the initial complaint and Harris' and Klebold's attack, the actions by School Defendants, non-parties, and myriad other factors, I cannot say, without speculation, that Plaintiffs have alleged adequately that the Sheriff Defendants, including Deputy Gardner, put Plaintiffs at substantial risk of a harm that was immediate or proximate.

*c.* ***Uhlrig*** **Test—Element Three—Obvious and Known Risk**

Element three requires that the risk be obvious and known. The risk that Columbine High School would be attacked was not obvious based solely on the Web site information. As to Deputy Gardner, however, with his alleged knowledge of Harris' and Klebold's conduct at Columbine, I conclude that the risk became obvious and known to him. Under these circumstances, the third *Uhlrig* element has been satisfied as to Deputy Gardner only. *See Medina,* 960 F.2d at 1496.

*d.* ***Uhlrig*** **Test—Element Four—Reckless Actions in Conscious Disregard of the Risk**

The fourth element requires that the Sheriff Defendants acted recklessly in conscious disregard of the risk that Harris and Klebold would attack Columbine High School.

The Web site contained no meaningful information pertaining to Columbine High School or its student body. As to Deputy Gardner, however, he is alleged not only to have possessed information about Harris' state of mind as reflected in the Web site but the individual School Defendants' knowledge of Harris' and Klebold' school activities as well. *See* C/O ¶ 74.

Under these allegations, the Sheriff Defendants made the following investigative efforts:

— responded to the Brown's complaint,

— interviewed the Browns on several occasions;

— involved the Jefferson County Sheriff's bomb squad in the investigation

— referred the complaint to Deputy Gardner

*See id.* Moreover, they attempted but failed to: 1) access the Web site; or 2) link the pipe bomb information to reported

pipe bomb activity in the area. *See* C/O Exhibit A.

Despite the alleged inadequacies of the Sheriff Defendants' investigation, under these circumstances I conclude for purposes of evaluating this *Uhlrig* factor only, the Sheriff Defendants, with the exception of Defendant Gardner, did not act recklessly in conscious disregard of the risk to Plaintiffs. As to Deputy Gardner, considering the nature of the information he allegedly gained over several months, I conclude that the fourth *Uhlrig* element is fulfilled.

### e. *Uhlrig* Test—Element Five—"conscience shocking" conduct

The fifth *Uhlrig* element requires that a defendant's conduct, when viewed in total, must be "conscience shocking." To "shock the conscience," a plaintiff must do more than show that the government intentionally or recklessly caused injury to a plaintiff by abusing or misusing government power. The plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking. *Id* at 574. The *Uhlrig* Court acknowledged, however, that the level of culpability that must be shown under the "shocks the conscience" standard is difficult to define.

In *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), a case in which the parents of a motorcycle passenger killed during a high speed police chase brought a § 1983 action, the Supreme Court provided a gauge to assess conduct alleged to be conscience-shocking. *Lewis* supplies a sound framework, grounded in common sense, for analyzing those myriad situations involving law enforcement and governmental workers deployed in emergency situations. The Court reiterated the important principle that rejects "the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct"

and held "that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Lewis*, 523 U.S. at 849, 118 S.Ct. 1708. The Court then observed that conscience-shocking behavior is most likely to be found "at the other end of the culpability spectrum"— that is, where there is an intent to do harm that is not justified by any government interest. *Id.* The *Lewis* Court further recognized that in the middle range of the culpability spectrum, where the conduct is more than negligent but less than intentional, there may be some conduct that is egregious enough to state a substantive due process claim. *See id.* at 849–50, 118 S.Ct. 1708.

Within this middle range, *Lewis* directs an examination of the circumstances surrounding the conduct at issue and the governmental interests at stake. The *Lewis* Court then points the inquiry to the official's opportunity for deliberation while drawing helpful analogies to the Eighth Amendment prison context. *See id.* at 850–55, 118 S.Ct. 1708 *citing, inter alia, Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *City of Revere*, 463 U.S. 239, 103 S.Ct. 2979; and *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The marked differences between, for instance, a normal custodial situation in a prison and a violent disturbance in a prison demonstrates "why the deliberate indifference that shocks in the one case is less egregious in the other." *Lewis* at 852–53, 118 S.Ct. 1708. The "deliberate indifference" standard is only utilized when actual deliberation is practical. *Id.*

Therefore, in assessing the constitutionality of law enforcement actions, a court is called upon to distinguish between emergency action and actions taken after

opportunity for reflection, giving great deference to the decisions that necessarily occur in emergency situations. On one end of the spectrum is official conduct that implicates negligent tort liability; conduct in which the state actor intended to cause harm and in which the state lacks any justifiable interest rests at the other end. In emergency situations, only conduct that reaches that far point will shock the conscience and result in constitutional liability. Where the state actor has the luxury to truly deliberate about the decisions he or she is making, something less than unjustifiable intent to harm, such as calculated indifference, may suffice to shock the conscience. *See also Radecki v. Barela,* 146 F.3d 1227 (10th Cir.1998); *cert. denied,* 525 U.S. 1103, 119 S.Ct. 869, 142 L.Ed.2d 771 (1999) (sheriff's deputy had no time for deliberation in making instantaneous judgment call in suddenly explosive law enforcement situation; therefore no § 1983 claim based on substantive due process violation).

■■■ In determining this question, I am also mindful that courts must be " 'reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this unchartered area are scarce and open-ended.' " *Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) *quoting Collins,* 503 U.S. at 125, 112 S.Ct. 1061. Courts must "exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of [judges]." *Glucksberg,* 521 U.S. at 720, 117 S.Ct. 2258. *See also Lewis,* 523 at 842, 118 S.Ct. 1708. Also, there is concern that § 1983 liability not replace state tort law and the need for deference to local policymakers in making decisions impacting upon public safety. *See Uhlrig,* 64 F.3d at 573. Moreover, the Due Process Clause "is not a guarantee against incorrect or ill-advised [government] decisions." *Collins v. City of Harker Heights Tex.,* 503 U.S. 115, 129, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). Because the "conscience-shocking" standard is difficult to define, *see Uhlrig,* 64 F.3d at 573, guidance is found in its application in other cases.

In *Armijo,* in which the parents of a student who committed suicide brought substantive due process claims, the Court construed the following conduct by school employees as conscience shocking: 1) suspending the student from school; 2) driving him home and leaving him alone with access to firearms despite some knowledge that he was suicidal and distraught; 3) failing to notify the student's parents of their actions. *Id.* at 1264.

The Tenth Circuit applied the conscience-shocking standard in *Liebson,* 73 F.3d 274, where a prison librarian was raped by an inmate, and alleged that corrections officials violated her substantive due process rights by recklessly failing to provide her with adequate security. The Court concluded that the defendants' negligence in removing a corrections officer from the library for the librarian's protection was not " 'so egregious, outrageous and fraught with unreasonable risk so as to shock the conscience.' " *Id.* at 276.

In *Sutton,* 173 F.3d 1226, a severely physically disabled student was sexually assaulted on several occasions by another student at a state school for the deaf and blind. Despite being notified of the assaults by the child's mother, the child was again assaulted by the same student. The *Sutton* Court was persuaded that Plaintiffs had stated a viable § 1983 failure to train or implement adequate policies claim that would "shock the conscience of federal judges" based on allegations that: 1) the defendant had notification of the child's severe physical impairments; 2) knew of the prior assaults; and 3) failed to take

action to prevent further attacks. *Id.* at 1241.

In dealing with the Brown's complaint, the Sheriff Defendants had ample opportunity for deliberation. Thus, deliberate indifference may shock the conscience. *See Lewis,* 523 U.S. at 853–54, 118 S.Ct. 1708; *Radecki,* 146 F.3d at 1232.

The Plaintiffs acknowledge that the Sheriff Defendants interviewed the Browns on more than one occasion, passed the information along to Deputy Gardner, consulted the bomb squad and made initial efforts to obtain a search warrant. The Sheriff Defendants attempted to access the Web site and link the pipe bomb information with reports of such activity in the area. *See* Exhibit A.

Deputy Gardner is alleged to have possessed all of the information known to the Sheriff Defendants and to the School Defendants. Thus, he had a view not only into Harris' and Klebold's thought processes through their writings, but had tangible proof of their ability to put their ideas and plans into action—through acquiring real weapons, target shooting, and rehearsing various violent scenarios. Moreover, during the school year, Deputy Gardner was at Columbine on a daily basis. Compared to the other Sheriff Defendants, he was in a position to respond to Harris' and Klebold's activities. Yet, it is alleged he took no action.

As illustrated by *Armijo, Liebson,* and *Sutton,* however, whether a defendant's conduct was found shocking or not to the conscience of the Court, in every case there was affirmative conduct by the defendant that directly and immediately resulted in severe physical or psychological injuries to another person or allowed such harm to occur or to continue. Here, however, Plaintiffs' claims are based on allegations that the Sheriff Defendants', including Deputy Gardner, failed to anticipate

and prevent *future* behavior by Harris and Klebold.

I conclude that the alleged actions of omissions by the Sheriff Defendants, including Deputy Gardner, fail to shock the conscience of this court in a Fourteenth Amendment substantive due process constitutional sense. *See Lewis,* 523 U.S. at 852–53, 118 S.Ct. 1708; *Radecki,* 146 F.3d 1227.

To state a danger creation claim, Plaintiffs must meet all five *Uhlrig* elements. *See Uhlrig,* 64 F.3d at 574–75. Because Plaintiffs' allegations do not satisfy all five *Uhlrig* factors, the Sheriff Defendants are entitled to dismissal of Claim Two.

**C. *Claim Three*—42 U.S.C. § 1983 Deprivation of right to life, liberty, and personal security—against Sheriffs Beckham and Stone, in their official capacities, and the Jefferson County Sheriff's Department, based on inadequate policies, practices, and training**

Claim Three asserts that the Jefferson County Sheriff's Department, former Sheriff Ronald Beckham, in his official capacity, and Sheriff John Stone, in his official capacity violated Plaintiffs' substantive due process rights by failing to implement adequate policies or adequately train the Sheriff's deputies so as not to violate Plaintiffs' constitutional rights. *See* C/O ¶ 137–38.

■■■■■■ In *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that:

a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or

acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 695, 98 S.Ct. 2018. Liability does not attach to the governmental entity pursuant to § 1983 for the acts of its employees unless the Plaintiff can show: 1) that a municipal employee committed a constitutional violation; and 2) a municipal policy or custom was the moving force behind the constitutional deprivation. *Myers v. Oklahoma County Bd. of County Comm'rs,* 151 F.3d 1313, 1317 (10th Cir.1998). The policy need not be formal or written. *Id.* at 691, 98 S.Ct. 2018. *See also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

### 1. Constitutional Violation

Plaintiffs have not made the requisite predicate showing of an underlying constitutional violation as to Claim Two against the Sheriff Defendants. *See* section (V)(B), *supra.* Therefore, Plaintiffs cannot meet this element. Assuming, however, a constitutional violation, I assess the second element also.

### 2. Policies, Procedures, Custom, or Training as Moving Force

■ A governmental entity or its policy makers may be liable pursuant to § 1983 if there is a failure to adequately train employees and that failure is the cause or the "moving force" behind the underlying constitutional deprivation. *See City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Myers,* 151 F.3d at 1317. A governmental entity " 'is only liable when it can be fairly said that the city itself is the wrongdoer.' " *Collins,* 503 U.S. at 122, 112 S.Ct. 1061.

*Myers* illustrated this concept in the context of allegations of the use of excessive force by police officers in responding to a domestic violence incident. The *Myers* Court held:

> the plaintiffs' failure to train claims, like their basic excessive force claim against the individual officers, requires a predicate showing that the officers did in fact use excessive force. . . .

*Myers,* 151 F.3d at 1317. *See also Trigalet v. City of Tulsa,* 239 F.3d 1150, 1156 (10th Cir.), *cert. denied,* ─── U.S. ───, 122 S.Ct. 40, 151 L.Ed.2d 13 (2001). It is only when the "execution of a government's policy or custom . . . inflicts the injury" that the governmental entity or its policy makers may be held liable under § 1983. *Monell,* 436 U.S. at 694, 98 S.Ct. 2018.

■ Here, Harris and Klebold were the "moving force" behind Plaintiffs' injuries. Plaintiffs' allegations that their injuries could have been avoided if there were different policies in place or adequate training do not state a viable claim.

### D. *Claim Eleven*—Violation of Colorado Constitution, Art. II, Secs. 6, 25, against Sheriff Defendants, except Jefferson County Sheriff's Department, in their individual capacities

Claim Eleven is based on Article II, Sections 6 and 25 of the Colorado State Constitution. Article II, Section 6 states:

> Courts of justice shall be open to every person, and a speedy remedy afforded for every injury to person, property or character; and right and justice should be administered with sale, denial or delay.

*Id.* Section 25 provides that "[n]o person shall be deprived of life, liberty or property, without due process of law." *Id.* at § 25.

■ There is, however, no implied cause of action arising directly from the Colorado Constitution. *See Brammer-Hoelter v. Twin Peaks Charter Academy,*

81 F.Supp.2d 1090, 1097 (D.Colo.2000); *Vanderhurst v. Colorado Mountain College Dist.*, 16 F.Supp.2d 1297, 1304 (D.Colo.1998). No statutory equivalent to 42 U.S.C. § 1983 exists under Colorado state law to enforce the state constitution. *Id.* Moreover, Colorado appellate courts have not recognized an implied cause of action to enforce the provisions of the Colorado Constitution. In *Board of County Comm'rs of Douglas County v. Sundheim*, 926 P.2d 545, 553 (Colo.1996), the Colorado Supreme Court addressed whether it has "the authority to recognize an implied damages action in cases where citizens allege that government entities have violated their state constitutional rights." *Id.* at 547. The Court concluded no such implied cause of action to enforce the Colorado Constitution should be recognized because "[w]hile it may be appropriate to recognize an implied state constitutional cause of action when there is no other adequate remedy ... where other adequate remedies exist, no implied remedy is necessary." *Id.* at 553.

As a matter of law, adequate remedies are available to Plaintiffs pursuant to their § 1983 claim and willful and wanton conduct claim. I decline to recognize an implied state constitutional cause of action for violation of Article II, Sections 6 and 25 of the Colorado State Constitution. The Sheriff Defendants are entitled to dismissal of Claim Eleven.

## VI.

### Qualified Immunity Analysis— Claim Two

I have concluded that Plaintiffs have not stated a claim for a constitutional violation in Claim Two. Qualified immunity provides an additional basis for dismissal of this claim.

The question is whether the constitutional rights allegedly violated were clearly established as of April 20, 1999 so that

reasonable police officers in the Sheriff Defendants' position would have understood that their actions were in violation of those rights. *See Siegert*, 500 US. at 232, 111 S.Ct. 1789; *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 516 (10th Cir. 1998).

▮▮▮▮ In determining whether the law involved was clearly established, I examine the law as it was at the time of Defendants' actions. *Hilliard v. City and County of Denver*, 930 F.2d 1516, 1518 (10th Cir.), *cert. denied*, 502 U.S. 1013, 112 S.Ct. 656, 116 L.Ed.2d 748 (1991). "[T]he plaintiff need not show that the specific action at issue has previously been held unlawful," he need only show that the alleged unlawfulness was apparent in light of preexisting law. *Id.* Ordinarily, for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other circuit courts must have found the law to be as a plaintiff maintains. *See Medina*, 960 F.2d at 1498; *Morfin v. Albuquerque Public Schools*, 906 F.2d 1434 (10th Cir.1990).

▮▮▮▮ It is a plaintiff's burden to convince the court that the law was clearly established. In doing so, a plaintiff cannot simply identify a clearly established right in the abstract and allege that a defendant has violated it. Instead, a plaintiff must make a particularized showing that the "contours" of the right are sufficiently clear that a reasonable state actor would understand that what he is doing violates that right. *See Patrick v. Miller*, 953 F.2d 1240, 1243 (10th Cir.1992) *citing Anderson*, 483 U.S. at 640, 107 S.Ct. 3034. Although a "precise factual correlation between the then-existing law and the case at-hand is not required," *Patrick*, 953 F.2d at 1249, the alleged unlawfulness must be "apparent" in light of preexisting law. *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034. If a

plaintiff is unable to demonstrate that the law allegedly violated was clearly established, the plaintiff is not allowed to proceed with the suit. *Hilliard,* 930 F.2d at 1518. Hence, I look to whether it was clearly established in April 1999 within a sufficiently analogous factual setting that the particular alleged conduct of the Sheriff Defendants was grounds for a § 1983 violation based on the allegations in Claim Two.

**A. Claim Two— § 1983—Deprivation of Substantive Due Process Rights Failure to Investigate—Special Relationship and Danger Creation— Qualified Immunity Defense**

Pursuant to the allegations in Claim Two, Plaintiffs must make a particularized showing that the "contours" of the special relationship and danger-creation jurisprudence in the context of police investigations were clearly established on April 20, 1999.

In *Armijo,* 159 F.3d 1253, the Tenth Circuit confirmed that the "danger-creation" doctrine was clearly established by 1998 at the latest. *See also Sutton,* 173 F.3d at 1241 (supervisor's individual liability for failure to train and/or failure to implement policy to prevent sexual assaults on severely disabled student was clearly established under danger-creation doctrine; "therefore, the contours of the right ... were clearly established ... and the defense of qualified immunity fails.").

In 1990, the Seventh Circuit held that when a citizen is in danger of dying the police have a duty to not cut off all avenues of lifesaving rescue without providing an alternative. *See Ross v. United States,* 910 F.2d 1422, 1432–33 (7th Cir.1990) (deputy sheriff committed a constitutional tort by ordering qualified bystanders not to rescue a drowning boy while not providing an alternative). Moreover, in *Kneipp v. Tedder,* 95 F.3d, 1199 (3rd Cir.1996), a case in which police officers cut off private sources of aid to an intoxicated woman who suffered grievous injuries, the Third Circuit found that the plaintiff raised a "triable issue of fact as to whether the police officers affirmatively placed [Ms. Kneipp] in a position of danger." *Id.* at 1211. I conclude that as of April 20, 1999, the "danger-creation" theory was clearly established in the Tenth Circuit.

 *Uhlrig* and *Armijo* addressed the contours of the special relationship doctrine before April 1999. However, these cases do not deal with the adequacy of police investigations. Indeed, the overwhelming majority of the cases addressing the "special relationship" and "danger-creation" doctrines concern police responses to drastic and dramatic emergency situations. Research fails to reveal case authority involving the adequacy of a police investigation in the context of this § 1983 claim.

Although a "precise factual correlation between the then-existing law and the case at-hand is not required," *see Patrick,* 953 F.2d at 1249, under the circumstances here, I cannot say that the Sheriff Defendants would have understood that their conduct was in violation of the United States Constitution. Consequently, the Sheriff Defendants are afforded qualified immunity on Claim Two.

**VII.**

**Claims against School Defendants**

**A. *Claim Four*—Willful and Wanton Conduct against Individual School Defendants, in their individual capacities, except the Jefferson County School District R–1**

The School Defendants move to dismiss Claim Four on the grounds that this claim: 1) is barred by the Colorado Governmental Immunity Act, Colo.Rev.Stat. § 24–10–118;

and 2) fails to state a claim upon which relief may be granted because Colorado's common law imposes no duty to protect others from harm by third parties and for lack of causation. For the following reasons, I grant the motion.

### 1. Colorado Governmental Immunity Act

As discussed in section (V)(A)(1), *supra*, the phrase "willful and wanton" is not defined in the CGIA. The definition of this term gleaned there from Colorado case law applies here.

 There is no dispute that individual School Defendants were "public employees." They had access to disturbing information about Harris and Klebold and their plans, through their videotapes, writings, and statements. With limited exceptions, the Complaint contains no specific allegations that the School Defendants shared their individual knowledge among themselves. It is alleged that the School Defendants knew of the Web site contents well before April 20, 1999. C/O ¶ 167. In deciding this question, I assess each School Defendant in light of the information each possessed.

### a. Defendant Talocco

Defendant Talocco, who taught a video production class, viewed videotapes created by Harris and Klebold containing the following information:

- a video filmed inside of the school showing Harris and Klebold shooting people using fake guns. C/O ¶ 152;
- a video presented in class showing Harris and Klebold carrying large weapons, presumably fake, down the school hallways. *Id.* at ¶ 153;
- a computer graphic presented in class showing Columbine High School blowing up. *Id.* at ¶ 154; and
- a video Mr. Talocco saw in the video lab in which Harris and Klebold were

firing real guns somewhere in the mountains *Id.* at 155–56.

In addition, in one or more of the videos and in Mr. Talocco's class, Harris and Klebold spoke of killing, of their ownership of guns and of their bombmaking ability. C/O ¶ 157. Mr. Talocco also knew about Harris' Web site. C/O ¶ 167.

Defendant Talocco was privy to information that demonstrated Harris' and Klebold's long time obsession with violent themes and ideas. Over time, this information included previews of Harris' and Klebold's plans for April 20, 1999, their desire to harm Columbine students, and tangible evidence of their present ability to do so. Plaintiffs plead facts that suggest Defendant Talocco's conduct was at least negligent and likely reckless. Plaintiffs fail to allege, however, sufficient specific factual allegations to raise a reasonable inference that Mr. Talocco purposefully pursued a course of action or inaction that he considered would probably result in the harm that befell Plaintiffs. Although a close question, I conclude that Mr. Talocco's conduct was not willful and wanton.

### b. Defendant Kelly

It is alleged that Dylan Klebold submitted his short story, *see* Exhibit B, to Defendant Kelly. Ms. Kelly was sufficiently alarmed that she shared it with Defendant Butts, a school counselor, C/O ¶ 151, and contacted Klebold's parents to share her concerns. This limited conduct cannot be deemed willful and wanton. In addition, it is alleged that Ms. Kelly knew of the Web site contents, C/O ¶ 167, and was privy to unspecified writings of Harris and Klebold. *See* C/O ¶ 160. Based on the vague and rambling nature of the Web site contents and the lack of information concerning the additional writings, I conclude Ms. Kelly's conduct was not willful and wanton.

#### c. Defendant Butts

Based on Plaintiffs' allegations, Mr. Butts knew of Klebold's story submitted in Ms. Kelly's class. C/O ¶ 151. He also knew of the Web site contents and "of Klebold's other activities." *Id.* Pursuant to these allegations, I must presume that Mr. Butts knew of the information possessed by Defendants Talocco, Johnson, Horvath, and Johnson. Thus, like Deputy Gardner, it is alleged generally that Defendant Butts possessed all the information known to the Sheriff Defendants and the School Defendants.

Unlike Defendant Gardner, Mr. Butts took some action based on the information he possessed. After Ms. Kelly brought the story to him, the two met, discussed Klebold's story, and decided that Ms. Kelly would contact Klebold's parents. Under these circumstances, although a close question, I conclude that Mr. Butts' conduct, as alleged, cannot be deemed willful and wanton.

#### d. Defendant Johnson

Defendant Johnson taught a Psychology class in which Harris and Klebold turned in writings revealing their malevolent feelings and plans. *See* C/O ¶ 163. There are no allegations concerning the specific nature or content or these materials. In addition, it is alleged he knew of the Web site, *see* C/O ¶ 167, which, although violent in content, was vague and rambling. Plaintiffs do not plead facts adequate to infer willful and wanton conduct on Defendant Johnson's part. *See Barham,* 928 P.2d at 1385.

#### e. Defendant Horvath

Defendant Horvath, the disciplinary assistant principal, allegedly knew of the Web site contents. C/O ¶ 167. He also had contact with Harris and Klebold, knew they were on probation for the van break in, and thought Harris "was on the edge of losing control." C/O ¶ 149. As a school official, Plaintiff's general allegation that "Columbine High School officials knew about Harris and Klebold talking about blowing up the school," *see id.* at ¶ 166, is applicable to him. It is not alleged that Mr. Horvath was privy to any of the information known by the other School Defendants.

As discussed, the Web site writings were vague, rambling rants directed at no particular group or person including Columbine or its students. I evaluate together, however, the Web site information, Mr. Horvath's alleged knowledge that Harris and Klebold had talked about "blowing up the school," and his observation that Harris "was on the edge of losing control." It is not alleged that Mr. Horvath knew about the videos, writings, and other statements. I cannot conclude that Defendant Horvath purposefully pursued a course of action or inaction that he considered would probably result in the harm to Plaintiffs. *See Moody,* 885 P.2d 200; *Pettingell,* 129 at 491, 271 P.2d at 1042.

#### f. Defendants DeAngelis and Cornell

Plaintiffs allege that Defendants DeAngelis and Cornell knew of the Web site well before April 20, 1999. C/O ¶ 167. As school officials, Plaintiffs' general allegation that "Columbine High School officials knew about Harris and Klebold talking about blowing up the school," *see id.* at ¶ 166, is applicable to these Defendants. The Complaint does not allege that Defendant DeAngelis or Defendant Cornell knew Harris and Klebold or had knowledge of the videotapes, writings, or discussions at issue here. Their knowledge of the Web site contents does not support the inference that their alleged failure to act was willful and wanton. Nor does the additional allegation concerning Harris and Klebold talking about blowing up the

**1166**

school add sufficient information to meet the willful and wanton standard.

### g. Defendant Tonelli

Defendant Tonelli, Harris' and Klebold's Government and Economics teacher, viewed a video they presented in class depicting themselves as "hit men" hired by "geeks" to avenge abuse by "jocks." C/O ¶ 164. In this video, filmed on school premises, Harris and Klebold enacted shooting "jocks," spoke of killing, and used a computer graphics scene of blowing up the school. *Id.* In addition, Mr. Tonelli knew of the Web site well before April 20, 1999. *Id.* at ¶ 167.

This violent video demonstrated Harris' and Klebold's interest in killing others, specifically Columbine students, with guns and explosives. In addition, Mr. Tonelli knew that Harris and Klebold had been obsessed with killing and weapons for some time. However, he saw only this one video and did not know of the writings and other videos. Although it is a close a question, I conclude that Mr. Tonelli's alleged failure to intervene was not willful and wanton.

In later addressing Claim Four against Defendants Butts, Horvath, Talocco, and Tonelli, I conclude that Plaintiffs have alleged conduct on their part that was reckless in conscious disregard of risk to Plaintiffs. That conclusion arguably negates their entitlement to immunity under the CGIA. I will assume it does. *See infra,* section (VII)(B)(2)(d). Consequently, for purposes of further analysis I conclude Plaintiffs' Claim Four is barred by the Colorado Governmental Immunity Act as to all School Defendants with the exception of Defendants Butts, Horvath, Talocco, and Tonelli.

### 2. Fed.R.Civ.P. 12(b)(6)

In the alternative, the School Defendants move, pursuant to Rule 12(b)(6), to dismiss Claim Four on the grounds that Colorado's common law imposes no duty on them and for lack of causation.

### a. duty

As I have discussed, Colorado's common law, like the Fourteenth Amendment, imposes no duty to protect others from harm by third parties even if such action is necessary to protect the person from injury. *See Solano,* 985 P.2d at 54. This general rule may be overcome only in certain circumstances, such as a special relationship between the parties, and after consideration of the factors set out in *Solano:* 1) foreseeability of harm; 2) social utility of the actor's conduct; 3) the magnitude of the burden of guarding against injury or harm; and 4) the practical consequences of imposing a duty. *Id.*

### i. existence of a special relationship between the parties

 A common law special relationship may be based upon the relationship between the defendant and the wrongdoer, or between the defendant and the victim. Whether a special relationship exists between a defendant and the wrongdoer depends upon the degree of control that the defendant has over the person. *Davenport,* 962 P.2d at 968; *Perreira,* 768 P.2d at 1215–16. In Colorado, a jailer does not exercise sufficient dominion over an inmate to create a special relationship where the inmate spends a substantial amount of time off the premises without direct supervision. *Davenport,* 962 P.2d at 968. As a result, there is no basis for asserting that the School Defendants had a special relationship with Harris and Klebold who spent substantial time off school premises without direct supervision.

Whether a common law special relationship exists between the School Defendants and the victim parallels the Due Process

Clause's special relationship inquiry. *Cf.*
*DeShaney,* 489 U.S. at 199–200, 109 S.Ct.
998 (special relationship arises when the
state deprives a person of his liberty to
such an extent that he is unable to care for
himself) with Restatement (Second) of
Torts, § 320 (1965) (special relationship
may arise when a person "takes the custo-
dy of another under circumstances such as
to deprive the other of his normal power of
self-protection or to subject him to associa-
tion with persons likely to harm him.")

The Complaint contains no allegations
that the School Defendants took control of
or had custody of the victims. Rather, the
Complaint treats the *in loco parentis* doc-
trine as a synonym for a "special relation-
ship," a position never taken in any of
Colorado's four education cases to use the
phrase. *See Trinidad Sch. Dist. No. 1 v.*
*Lopez,* 963 P.2d 1095, 1114 (Colo.1998);
*University of Colorado v. Derdeyn,* 863
P.2d 929, 938 (Colo.1993); *University of*
*Denver v. Whitlock,* 744 P.2d 54, 59 (Colo.
1987); *Cline v. Knight,* 111 Colo. 8, 137
P.2d 680 (1943). Based on these authori-
ties and the analysis in section
(V)(A)(2)(iii), *supra,* there is no legal sup-
port for the Plaintiffs' position that the
School Defendants were *in loco parentis*
with Richard Castaldo. Thus, I conclude
that there was no special relationship
among the School Defendants, the Plain-
tiffs, or Harris and Klebold. However, I
assume *arguendo* a special relationship
among the parties and examine the *Solano*
factors to determine the existence of a
duty.

ii. **Solano Factors**

a. **Foreseeability**

Specific individual School Defendants
had access to disturbing information about
Harris and Klebold and their plans,
through their videotapes, writings, and
statements, all of which have been dis-
cussed. Again, with limited exception, the
Complaint contains no specific allegations
that the School Defendants shared their
individual knowledge among themselves.
According to the Complaint, as alleged in
the alternative, the Sheriff Defendants in-
formed the School Defendants of the Web
site contents. C/O ¶ 167. Accordingly, in
assessing foreseeability, I look separately
to each School Defendant in light of the
information they possessed.

1. **Defendant Talocco**

Defendant Talocco, who taught a video
production class, viewed videotapes con-
taining the following information:

- Harris and Klebold shooting people
using fake guns and filmed in the school.
C/O ¶ 152;
- scenes of Harris and Klebold carrying
large weapons, presumably fake, down
the school hallways. *Id.* at ¶ 153;
- a computer graphic showing Colum-
bine High School blowing up. *Id.* at
¶ 154; and
- Harris and Klebold firing real guns.

*Id.* at 156. In addition, in one or more of
the videos and in Mr. Talocco's class, Har-
ris and Klebold spoke of killing, of their
ownership of guns and of their bombmak-
ing ability. C/O ¶ 157. Mr. Talocco also
knew of Harris' Web site writings. *Id.* at
¶ 167.

Foreseeability includes factoring
in "the setting of modern life" and "com-
mon sense perceptions of the risks" a "rea-
sonably thoughtful person would take ac-
count of in guiding practical conduct." *See*
*Solano,* 985 P.2d at 54, *citing Taco Bell,*
744 P.2d at 48. Defendant Talocco was
privy to previews of Harris' and Klebold's
plans for April 20, 1999. Their intent to
harm Columbine students, as well as tangi-
ble evidence of their ability to do so, was
discernible from the information known to
Mr. Talocco. Moreover, Mr. Talocco knew
that such violent themes had been part of

Harris' and to some extent Klebold's life for some time. I conclude, therefore, that this factor weighs in favor of imposing a duty on Mr. Talocco.

### 2. Defendant Kelly

█ It is alleged that Dylan Klebold submitted his short story, *see* Exhibit B, to Defendant Kelly who shared it with Defendant Butts, a school counselor. C/O ¶ 151. Ms. Kelly was privy to other unspecified writings of both Harris and Klebold. *See* C/O ¶ 160. Since there is no specific allegations about other writings, I am unable to assess their impact on this question. In addition, it is alleged Ms. Kelly knew of the Web site information. As stated before, Klebold's story, without more is insufficient to find that the events of April 20, 1999 were foreseeable to Ms. Kelly. There is nothing contained in the Web site writings that would have linked the story to Columbine. This additional information did not make the Columbine attack foreseeable to Ms. Kelly.

### 3. Defendant Butts

█ Mr. Butts knew of Harris' Web site, C/O ¶ 167, Klebold's writing submitted in Ms. Kelly's class, C/O ¶ 151, and "Klebold's other [school] activities." *See id.* Thus, he is generally alleged to have known all the information possessed by the other School Defendants. Defendant Talocco was privy to previews of Harris' and Klebold's plans for April 20, 1999, their intent to harm Columbine students, as well as tangible evidence of their ability to do so. Moreover, he knew that violent thinking had been part of Harris' and to some extent Klebold's life for some time. I conclude, therefore, that this factor weighs in favor of imposing a duty on Mr. Butts.

### 4. Defendant Johnson

█ Defendant Johnson taught a Psychology class in which Harris and Klebold turned in writings revealing their malevolent feelings and plans. *See* C/O ¶ 163. He also knew of the Web site contents. Without more, this is insufficient for foreseeability as to Mr. Johnson.

### 5. Defendant Horvath

█ Defendant Horvath, the disciplinary assistant principal, had contact with Harris and Klebold, knew they were on probation for the van break in, and thought Harris "was on the edge of losing control." C/O ¶ 149. He also knew of the Web site contents. It is alleged he knew for more than a year before the attack that Harris and Klebold talked about blowing up the school. C/O ¶ 166. It is not alleged, however, that he had any knowledge of the videos, writings, and other statements at issue here. Harris' and Klebold's talk about blowing up Columbine focused the general nature of the Web site information. Defendant Horvath had personal contact with Harris and Klebold and thought Harris was close to losing control. Under these allegations, I conclude this factor weighs in favor of imposing a duty on Mr. Horvath.

### 6. Defendants DeAngelis and Cornell

█ Defendants DeAngelis and Cornell allegedly knew of the Web site information. C/O ¶ 167. Plaintiffs also allege they knew for more than a year before the attack that Harris and Klebold talked about blowing up the school. C/O ¶ 166. The Complaint does not allege that Defendant DeAngelis or Defendant Cornell knew Harris and Klebold or had specific knowledge of the videotapes, writings, or discussions at issue here. Therefore, I conclude there was no foreseeability as to these Defendants.

### 7. Defendant Tonelli

█ As set out above, Defendant Tonelli had knowledge of the Web site. C/O

¶ 167. In addition, he viewed one particularly explicit, graphic, video in which Harris and Klebold portrayed themselves shooting "jocks," spoke of killing, and used a computer graphics scene of blowing up the school. *See* C/O ¶ 64. Although Mr. Tonelli had less information than Mr. Talocco, based on the extent and nature of the content of this video, I conclude there was sufficient information to render the assailants' conduct foreseeable.

In summary, based on the information known to the individual School Defendants, the foreseeability factor weighs against imposing a duty on these Defendants, with the exception of Defendants Butts, Horvath, Talocco and Tonelli.

#### b. Social Utility

In their Response, Plaintiffs focus on the alleged misconduct of the School Defendants. Again, the proper inquiry is the social utility of the Jefferson County School District as a whole. *See Davenport,* 962 P.2d at 968–69.

The social utility of the School District and its employees is, without question, high. This factor weighs against imposition of a duty.

#### c. magnitude of the burden of guarding against injury or harm

Citing *Perreira,* 768 P.2d 1198, the School Defendants posit their burden in terms of the unfairness of expecting them to "detect within their students a latent capacity for violence" akin to the psychiatrist in *Perreira.*

The expectation of predicting violent behavior in certain circumstances was converted to a legal duty for practicing psychiatrists just over a decade ago. See *id.* Psychiatrists, of course, are in a therapeutic relationship with their patients, possessing the training and authority to conduct specifically targeted assessments to determine a patient's capacity for violence

including the power to place a patient in protective custody. *See* Colo.Rev.Stat. § 27–10–10. In addition, these mental health professionals are immunized from civil liability for failing to predict violent behavior unless the patient communicates a serious threat of imminent physical violence against a specific person or persons. *See id.* at § 117.

Colorado case law does not require lay citizens to predict the future violent behavior of others. *See Solano,* 985 P.2d at 54–55; *Leake,* 720 P.2d 152. For example, in *Molosz v. Hohertz,* 957 P.2d 1049 (Colo. App.1998), tenants sued their landlords after a neighboring tenant, the landlords' son who had a criminal record and had engaged in two prior acts of violence, fired shots through their wall. The Colorado Court of Appeals held:

> unlike the psychiatrist in *Perreira,* defendants could not reasonably predict when the tenant might be violent, nor did they have the power to place or keep him in a lock-up situation to prevent harm to others.

*Molosz,* 957 P.2d at 1051. Not surprisingly, lay citizens, including educators, are not provided such immunization from liability because they have no specialized education or training in assessing or predicting violent tendencies in others.

Educators, untrained and inexperienced in observing, diagnosing, and treating mental health issues are not held to the same standard as trained mental health professionals. *See* § 13–21–117. However, under *Taco Bell* and *Lannon,* the School Defendants, were expected to use common sense and ordinary judgment in assessing the knowledge they possessed about Harris' and Klebold's school activities.

In assessing this factor, I rely on the allegations set out in section (VII)(A)(2)(a)(ii)(*a*), *supra,* assessing fore-

seeability. Based on the information known to the individual School Defendants, this factor weighs against imposing a duty against the School Defendants, with the exception of Defendants Butts, Horvath, Talocco and Tonelli.

### d. Practical Consequences of Placing a Duty

Defendants argue that absent the threat of legal liability, the Columbine educators had no motivation to seek out, anticipate, and prevent the attack upon Columbine High School. This argument ignores that the educators themselves were targets. They had every reason to seek out and prevent the attack. Plaintiffs respond simply by stating that this argument is "contrary to fundamental concepts of tort law." Neither argument is persuasive. Thus, this factor is in equipoise.

Assuming a requisite special relationship, application of the relevant *Solano* factors to Plaintiffs' allegations yield no duty upon these Defendants sufficient to state a cognizable claim. This is a close question, however, as to Defendants Butts, Horvath, Talocco, and Tonelli.

### b. Causation

Assuming a duty, the School Defendants argue that they were not the legal cause of Plaintiffs' injuries. I agree.

 To prevail on a tort claim, a plaintiff must show that the tortious conduct proximately caused his or her injuries. *Leake,* 720 P.2d at 155. While causation generally is a question of fact for a jury, a court may decide the issue as a matter of law where the alleged chain of causation is too attenuated to impose liability. *See Largo Corp. v. Crespin,* 727 P.2d 1098, 1103 (Colo.1986); *Smith v. State Compensation Ins. Fund,* 749 P.2d 462, 464 (Colo.App.1987).

 Proximate cause requires that a defendant's conduct produced the injury

"in the natural and probable sequence of things." *City of Aurora v. Loveless,* 639 P.2d 1061, 1063 (Colo.1981); *Schneider v. Midtown Motor Co.,* 854 P.2d 1322 (Colo. App.1992). "[Proximate cause] is the cause without which the claimed injury would not have been sustained." *Loveless,* 639 P.2d at 1063.

 Richard Castaldo's injuries were inflicted by Dylan Klebold and/or Eric Harris. *See* C/O ¶ 24. To conclude that the Columbine educators' conduct produced Plaintiffs' injuries, requires connecting a series of "if ... then ... " propositions which are speculative at best.

For example, the proposition that if the School Defendants had initiated disciplinary proceedings against Harris and Klebold, then the attack would have been prevented, begins with the uncertain assumption that students may be suspended or expelled for submitting work with dark themes or violent images, and concludes with the assumption that suspending or expelling students from school effectively eliminates their ability to return with firearms. Similarly, the proposition that if these Defendants had contacted Harris' and Klebold's parents, then the attack would have been prevented is contradicted by the allegation that Ms. Kelly did contact the Klebold family about the story their son submitted in her class.

 Alleged tortious conduct must also be a "substantial factor" in producing the injury. *See North Colo. Medical Ctr., Inc. v. Committee on Anticompetitive Conduct,* 914 P.2d 902, 908 (Colo.1996); *Smith,* 749 P.2d at 464. If an event other than the defendant's alleged conduct appears predominant, the defendant's conduct cannot be a substantial factor. *North Colo. Medical Ctr.,* 914 P.2d at 908; *Smith,* 749 P.2d at 464. In *Smith,* the widow of a man killed in an alcohol-related motorcycle accident alleged that the defendants' fail-

ure to timely complete a vocational rehabilitation plan caused her husband to drink. The court accepted as true that the defendants' negligence contributed to the accident but held as a matter of law that the decedent's operation of a motorcycle after drinking was the predominant cause, eliminating liability for the defendants. *Id.*

Harris' and Klebold's actions on April 20, 1999 were the predominant, if not sole, cause of Plaintiffs' injuries. "Colorado's proximate cause rule is intended to ensure that casual and unsubstantial causes do not become actionable." *North Colorado Medical Center,* 914 P.2d at 908. As a matter of law, Plaintiffs have failed to allege that the individual School Defendants' conduct was a legal cause of Plaintiffs' injuries.

B. **Claim Five—42 U.S.C. § 1983—Deprivation of right to life, liberty, and personal security—against individual School Defendants, in their individual capacities, except the Jefferson County School District R–1 based on special relationship and creating or substantially enhancing the danger faced by Plaintiffs**

Plaintiffs allege that "Defendant DeAngelis' and the other School Defendants' toleration of bullying and abusive student-on-student behavior created a 'Lord of the Flies' environment at Columbine High School in which students were left to their own devises to tolerate, retaliate, or avenge abusive conduct by other students." C/O ¶ 195. Plaintiffs allege further that "Defendant DeAngelis and his staff, acting in conjunction with the Sheriff Defendants, [created] the danger that this environment would result and erupt in serious or lethal student-on-student violence." *Id.* at ¶ 196.

I set out at length the history of the Due Process Clause and § 1983 as well as the holdings of *DeShaney* and its progeny. A significant number of the cases discussed in section (V)(B), *supra,* deal with school officials. I again emphasize that, generally, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *See DeShaney,* 489 U S. at 197, 109 S.Ct. 998. Absent a special relationship or the School Defendants' creation of the danger that Plaintiffs faced, there is no constitutional duty to protect. *See id.*

Again, in the Tenth Circuit, school officials have no constitutional duty to protect students based on mandatory school attendance from the private actions of third parties. *See Graham,* 22 F.3d at 994–95; *Maldonado,* 975 F.2d at 732. This is true even when public officials know of an individual's capacity for violence. *See Graham,* 22 F.3d at 994–95 (no duty despite school's prior knowledge of specific threats of violence against student); *Armijo,* 159 F.3d at 1261 (no duty to protect student with known suicidal ideation from self-inflicted harm).

1. **Special Relationship**

Pursuant to *DeShaney,* "[t]he affirmative duty to protect arises *not from the State's knowledge of the individual's predicament* ... but from the limitation which it has imposed on his freedom to act on his own behalf." *DeShaney,* 489 U.S. at 200, 109 S.Ct. 998. (emphasis added). Unlike criminal incarceration and involuntary commitment to a mental health facility, public education does not impose a sufficient limitation upon students' freedom to act to create a special relationship. *See Vernonia School Dist.,* 515 U.S. at 655, 115 S.Ct. 2386; *Seamons,* 84 F.3d at 1236; *Graham,* 22 F.3d at 994. *See also O'Hayre v. Board of Educ.,* 109 F. Supp.2d 1284, 1289 (D.Colo.2000).

Plaintiffs do not argue or allege that the School Defendants placed limitations upon

their freedom to act at any time. Under these circumstances, as a matter of law, no special relationship existed between the School Defendants and the Plaintiffs.

## 2. State–Created or Enhanced Danger

 In a narrative manner, Plaintiffs allege that Harris and Klebold were motivated in their attack by feelings of resentment created by harassment and bullying tolerated by the faculty, forcing Harris and Klebold to resort to the extreme measures of revenge as described by them to numerous witnesses. *See* C/O ¶ 27. To determine whether Plaintiffs have stated a danger creation claim, I again apply the *Uhlrig* factors in light of their allegations.

### a. *Uhlrig* Test—First Element—Member of Limited and Specifically Definable Group

Plaintiffs contend that as Columbine High School students, the victims, including Richard Castaldo, were members of a limited and specifically identifiable group. Citing *Sutton,* in which the victim was a deaf, blind, and mute student who required personal assistance and *Armijo,* in which the victim was a mentally unstable student with suicidal ideations, the School Defendants argue that the victims did not possess some characteristic by which they were identified apart from the shooting or that rendered them vulnerable to the attack. I do not view this element so narrowly here.

Based on Harris' and Klebold's writings, videotapes, and statements, apparently the only characteristic necessary to be the object of their rage was to be a Columbine High School student at school on April 20, 1999. Although in this case the group was large, it was specific to Columbine High School students rather than students at any high school. Plaintiffs have met the first *Uhlrig* element.

### b. *Uhlrig* Test—Element Two—Substantial Risk of Serious, Immediate, and Proximate Harm

The School Defendants cannot dispute that the harm at issue was serious. Rather, they contend that the risk facing the Plaintiffs was neither immediate nor proximate. Plaintiffs themselves acknowledge that the alleged harm was not "immediate and proximate," but something that was "probably inevitable." *See* C/O ¶ 195. *Graham* teaches that the risk must be of a limited duration, not merely that a person may act violently in the future. *Id.* at 995. The events that unfolded happened over at least thirteen months rendering it impossible for Plaintiffs to meet this element.

### c. *Uhlrig* Test—Element Three—Obvious and Known Risk

The School Defendants frame the risk in terms that it must have been obvious and known to them that Harris and Klebold would commit mass murder. *See* School Defendants' Brief, p. 14. I do not agree. The risk framed by the Complaint was that Harris and Klebold would act on their unfulfilled plans to violently harm students at Columbine High School.

Pursuant to the allegations as to each School Defendant, *see* section (VII)(A)(1)(a-f), *supra,* I conclude that Plaintiffs have met this element as to Defendants Butts, Horvath, Talocco, and Tonelli only.

### d. *Uhlrig* Test—Element Four—Conscious Disregard of the Obvious or Known Risk

This element requires that the School Defendants were subjectively aware of the risk at hand. *See Uhlrig,* 64 F.3d at 573 n. 8 (recklessness requires proof that defendant focused on the risk and deliberately assumed or acquiesced in such risk); *Archuleta v. McShan,* 897 F.2d 495, 499 (10th Cir.1990) ("[R]ecklessness includes an ele-

ment of deliberateness—a conscious, acceptance of a known, serious risk."). Pursuant to the allegations as to each School Defendant, I again conclude that Plaintiffs have met this element as to Defendants Butts, Horvath, Talocco, and Tonelli only.

### e. *Uhlrig* Test—Element Five—"conscience shocking" conduct

Under this element, I assess conduct from two perspectives—both of which occurred under non-emergency circumstances.

Assuming Plaintiffs' allegations as true, *see Tonkovich,* 159 F.3d at 510, the School Defendants' acquiesced in student-on-student teasing, intimidation, bullying, and verbal harassment by Columbine students other than Klebold and Harris. *See C/O* ¶ 187(g). While such alleged conduct represents bad educational judgment, in cases dealing with markedly more egregious behavior, courts have consistently failed to find constitutional conscience shocking behavior. For example, in *Martinez v. Chama Valley Indep. Sch. Dist. No. 19,* 77 F.3d 1253 (10th Cir.1996), a teacher repeatedly calling a twelve year old girl a prostitute did not shock the judicial conscience. Similarly, in *O'Hayre,* a principal shoved a student into a locker. *Id.* at 1290. In *Lillard v. Shelby County Bd. of Educ.,* 76 F.3d 716, 725–26 (6th Cir.1996) the Sixth Circuit held that a teacher slapping a student did not shock the judicial conscience.

In this case, the School Defendants' alleged toleration of bullying, teasing, and intimidation on the part of the Columbine student body, while reprehensible if true, is not conscience shocking in a Fourteenth Amendment substantive due process sense.

I also evaluate the School Defendants' conduct in failing to respond to Harris' and Klebold's disturbing school activities. As discussed in *Lewis,* where circumstances require instant judgment, no substantive due process claim can lie unless the officials' conduct was "tainted by an improper or malicious motive." *Id.* at 855, 118 S.Ct. 1708. Where as here, however, the state actors have the time to truly deliberate, something less than intent to harm, such as calculated indifference, may shock the conscience of the Court. *See id; Radecki,* 146 F.3d 1227.

In this case, there was no emergency. Rather, several of the School Defendants had daily contact with Harris and Klebold. Defendants had ample time to consider the information each possessed about Harris and Klebold. *See Lewis.* I evaluate the factual allegations set out previously as measured against the circumstances in relevant cases in determining whether the School Defendants' conduct is "conscience shocking."

In *Martinez,* 77 F.3d 1253, a teacher who allegedly called a twelve-year-old student a prostitute in front of her class over a period of several weeks and allowed other students to do the same engaged in an obvious abuse of authority and flagrant misconduct. Yet this conduct was not shocking to the Court's conscience. In *Garcia v. Miera,* 817 F.2d 650 (10th Cir. 1987), *cert. denied,* 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988) a nine-year-old student was held upside down by a teacher and beaten on the legs with a split wooden paddle by the principal resulting in bleeding, a welt, a two-inch cut, and a permanent scar. This behavior was held to be conscience shocking.

As illustrated by these cases, whether or not a defendant's conduct was found shocking to the conscience of the Court, there was affirmative conduct by a defendant that directly and immediately resulted in severe physical or psychological injuries to another person or allowed such harm to occur or to continue. Here, how-

ever, Plaintiffs' claims are based on allegations that the School Defendants failed to anticipate and prevent *future* behavior by Harris and Klebold. I conclude that the School Defendants' alleged actions of omission fail to rise to the level of "conscience shocking" in a constitutional sense. *See Lewis*, 523 U.S. at 852–53, 118 S.Ct. 1708; *Radecki*, 146 F.3d 1227.

Because Plaintiffs have not met all of the *Uhlrig* factors, the School Defendants are entitled to dismissal of Claim Five.

### C. *Claim Six*—42 U.S.C. § 1983—Deprivation of right to life, liberty, and personal security—against Defendants DeAngelis, in his Official Capacity, and the Jefferson County School District R–1, for Inadequate Policies, Customs, Practices, and Training

Pursuant to Claim Six, Plaintiffs assert that Defendant DeAngelis, in his official capacity and the Jefferson County School District R–1 violated their substantive due process rights by failing to formulate policies and practices and failing to provide training to Columbine High School staff. *See* C/O ¶ 215.

 Under *Monell*, the School District and its policy makers may not be held liable pursuant to § 1983 unless one of the School District employee's committed a constitutional violation and a School District policy or custom was the moving force behind the constitutional deprivation. *See id.* at 695, 98 S.Ct. 2018. *See also, Myers*, 151 F.3d at 1317. This rule applies to failure to train claims. *See Myers*, 151 F.3d at 1317.

 Plaintiffs have not made the requisite predicate showing of an underlying constitutional violation. Therefore, Plaintiffs cannot meet this element. In addition, Harris and Klebold were the "moving force" behind Plaintiffs' injuries. Plaintiffs' allegations that their injuries could

have been avoided if there were different policies in place or adequate training fail to state a claim upon which relief may be granted.

### D. *Claim Twelve*—Violation of Colorado Constitution, Art. II, Secs. 6, 25, against School Defendants, except Jefferson County School District R–1, in their individual capacities

Claim Twelve, based on Article II, Section 10 of the Colorado State Constitution, mirrors the Sheriff Defendants' Claim Eleven. Based on the analysis and reasoning set out in section (V)(D), *supra*, the School Defendants are entitled to dismissal of Claim Twelve.

## VIII.

### Qualified Immunity Analysis— Claim Five

Qualified immunity also requires dismissal of Claim Five.

The question is whether the constitutional rights alleged to have been violated in Claim Five were clearly established as of April 20, 1999 so that reasonable school teachers and officials in the School Defendants' positions would have understood that their actions were in violation of these rights. *See Siegert*, 500 US. at 232, 111 S.Ct. 1789; *Tonkovich*, 159 F.3d at 516.

As stated, the "danger-creation" doctrine has been clearly established in the Tenth Circuit since 1998. *See Armijo*, 159 F.3d 1253. Similarly, the "special relationship" doctrine can be said to have been clearly established in *Uhlrig* and *Armijo*. Plaintiffs bear the additional burden of pointing to case law existing as of April 1999 with facts sufficiently analogous to demonstrate the alleged unlawfulness of the School Defendants' conduct. *See Patrick*, 953 F.2d at 1249.

Plaintiffs cite *Sciotto v. Marple New-town Sch. Dist.*, 81 F.Supp.2d 559, 570 (E.D.Pa.1999) for the proposition that as of January 1997:

[i]t was clearly established that a student enjoyed a constitutional right to be free from school official's deliberate indifference to, or acts that increase the risk of serious injury from unjustified invasions of bodily integrity perpetuated by third parties.

*Id.*

■ Under the doctrine of qualified immunity, for the law to be clearly established, there must be *Supreme Court or circuit court authority* that has found the law to be as the plaintiff maintains. *See Medina,* 960 F.2d at 1498; *Morfin,* 906 F.2d 1434. (emphasis added). *Sciotto,* a district court case from a foreign jurisdiction, offers no support for Plaintiffs' position.

Plaintiffs rely also on *Davis* in which the Supreme Court refers to common law duties as guideposts for school officials that "they may be held responsible under state law for their failure to protect students from the tortious acts of third parties." *See Davis,* 526 U.S. at 644, 119 S.Ct. 1661. *Davis* does not apply here. The Court's statement is *dicta,* the case pertained to Title IX, a statute, and it was decided after April 20, 1999.

Research reveals no Supreme Court or circuit court authority addressing circumstances sufficiently similar or analogous to those facing the School Defendants. Indeed, Plaintiffs' Response acknowledges as much because "[i]n these Columbine cases now confronting us, the facts distinguish every other case which has come before." Response, p. 72. Accordingly, I grant the School Defendants immunity as to Claim Five.

Accordingly, IT IS ORDERED that:

1. Claim One against the Sheriff Defendants, in their individual capacities, is DISMISSED;

2. Claim Two against the Sheriff Defendants, in their individual capacities, is DISMISSED;

3. Claim Three against Sheriffs Beckham and Stone, in their official capacities, and the Jefferson County Sheriff's Department is DISMISSED;

4. Claim Four against the School Defendants, in their individual capacities, is DISMISSED;

5. Claim Five against the School Defendants, in their individual capacities, is DISMISSED;

6. Claim Six against Defendant DeAngelis, in his official capacity, and the Jefferson County School District R-1 is DISMISSED;

7. Claim Eleven against the Sheriff Defendants, in their individual capacities, is DISMISSED; and

8. Claim Twelve against the School Defendants, in their individual capacities, is DISMISSED.